THE STATE OF KANSAS V. HUGH O'NEIL.

1. MURDER — *Information — Use of Different Means.* Where a murder may have been committed by different means, and it is doubtful which was employed, its commission by all may be charged in one count of the information, and proof of any one will sustain the allegation, but the means so charged in the same count of the information must not be repugnant.

2. EVIDENCE — *Previous Assaults.* Ill treatment and previous assaults by husband on wife are admissible to prove motive, in cases of marital homicide.

3. —— *Reading Books to Jury.* In addressing the jury in a criminal cause, counsel may be allowed, in the discretion of the trial court, to read from standard works on matters of science and art, when pertinent, by way of argument or illustration; but it would be an abuse of this privilege to make it the pretense of getting improper matter before the jury as evidence, or to present matters of law conflicting with the instructions of the court.

4. INTOXICATION *as a Defense.* Voluntary intoxication is no justification or excuse for crime. (*The State v. Yarborough,* 39 Kas. 581.)

5. DELIBERATE PREMEDITATION — *Intoxication — Evidence.* Under a statute establishing degrees of the crime of murder, and providing that willful, deliberate and premeditated killing shall be murder in the first degree, evidence that the accused was intoxicated at the time of the killing is competent for the consideration of the jury upon the question whether he was in such a condition of mind as to be capable of deliberate premeditation.

6. MENTAL CAPACITY — *Responsibility for Acts.* Where a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is generally responsible if he commits such act or acts, whatever may be his capacity in other particulars; but if he does not possess this degree of capacity, then he is not so responsible. (*The State v. Nixon,* 32 Kas. 205; *The State v. Mowry,* 37 id. 369.)

*Appeal from Marion District Court.*

ON the 4th day of December, 1891, an information was filed in the district court of Marion county against *Hugh O'Neil,* charging him with the murder of Mary O'Neil, his

wife.    On March 1, 1892, an amended information was filed, which, omitting caption, verification, and indorsements, was as follows:

"In the name and by the authority of the state of Kansas, I, W. H. Carpenter, county attorney in and for the county of Marion, in the state of Kansas, who prosecutes for and on behalf of said state in the district court of said county, sitting in and for the county of Marion, and duly empowered to inform of offenses committed within said county of Marion, come now here and give the court to understand and be informed that one Hugh O'Neil, at the county of Marion, in the state of Kansas aforesaid, and within the jurisdiction of this court, on the 18th day of November A. D. 1891, did then and there feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, make an assault in and upon one Mary O'Neil, with the intent her, the said Mary O'Neil, feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, to kill and murder; and that the said Hugh O'Neil did then and there feloniously, willfully, deliberately, premeditatedly, and with malice aforethought, and with a certain blunt instrument, to said county attorney unknown, and in a manner to said county attorney unknown, feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, and with the intent aforesaid, inflict upon the head, face, and body of her, the said Mary O'Neil, certain mortal wounds, bruises, cuts, and contusions; and that the said Hugh O'Neil did then and there feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, and with the intent aforesaid, strike, kick, beat and choke her, the said Mary O'Neil, with his hands and feet, in and upon the head, face, neck, legs, arms, and other parts of the body of her, the said Mary O'Neil, thereby inflicting certain other mortal wounds, bruises, cuts and contusions on her, the said Mary O'Neil; and that the said Hugh O'Neil did then and there feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, and with the intent aforesaid, cast and throw said Mary O'Neil down upon the ground, and against a certain stone wall, with great force and violence, thereby inflicting upon the head, face, legs, arms and other parts of the body of her, the said Mary O'Neil, certain other mortal wounds, bruises, cuts and contusions, of which mortal wounds, bruises, cuts and contusions so received by said Mary O'Neil as aforesaid, and so inflicted upon her, the said Mary O'Neil, by said

Hugh O'Neil as aforesaid, Mary O'Neil did then and there instantly die. Wherefore, the said county attorney sayetq that said Hugh O'Neil did then and there feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, and with the intent aforesaid, kill and murder the said Mary O'Neil, contrary to the statute in such cases made and provided, and contrary to the peace and dignity of the state of Kansas."

The defendant challenged the information by a motion to quash, by a motion to compel the state to elect, and by a motion in arrest of judgment, which were overruled. On the 21st of March, 1892, the trial of the cause was commenced, and continued from day to day until the 4th of April, 1892. After hearing the evidence, the instructions of the court, and the argument of counsel, the jury returned a verdict against the defendant of guilty of murder in the second degree. On the 4th of April, 1892, the motion for a new trial, which had been filed by the defendant, was overruled, and thereupon the court sentenced him to confinement in the penitentiary of the state for 25 years, at hard labor. He appeals.

*Frank Doster*, and *Madden Bros.*, for appellant:

1. The defendant attacked this information by motion to quash, by motion to compel the state to elect, and by motion in arrest of judgment.

The court overruled all motions leveled against it, to which the defendant properly excepted. It will be seen that at least three separate death strokes or attacks upon deceased are alleged in the one count, with all the distinctness and separate formality of three several counts, without appropriating the assault alleged to either, and without alleging which of the same the deceased died of or whether she died of all. This is no compliance with the statute that requires the information to state the facts constituting the offense in plain and concise language, without repetition. The information was bad for duplicity, uncertainty, indefiniteness, and want of precision. The strokes complained of were either inflicted as

a part of different transactions or as part of the same trans-
action.   No other ways are possible.   (1) If they were part
of different transactions, they would be separate offenses, and,
according to the precedents, they could be joined in the same
informations but in different counts.   10 Am. & Eng. Encyc.
of Law, 699;  *The State v. Goodwin*, 33 Kas. 538;  *The State
v. Hodges*, 45 id. 392.   (2) If the strokes were part of the
same transaction, it is proper to charge them in different
counts to meet the exigencies of the proof, even if the several
counts are repugnant and inconsistent with each other.   10
Am. & Eng. Encyc. of Law, 699; 1 Whar. Pl. & P., § 297.
This rule is expressly sanctioned by our statute.   Crim. Code,
§ 123.   (3) If the strokes were part of the same transaction,
they may all be set forth as such in one count, alleging that
death occurred from the combined effect of all.   This rule
has a limitation that the acts must not be inconsistent or re-
pugnant with each other.   1 Bish. Cr. Proc., § 453.   Neither
of these precedents is observed in the present case.   The
manner of statement distinctly suggests that the informant
intended to charge three separate and distinct offenses, which
were separate charges of murder, or felonious assaults at
least, on which a separate conviction could have been had if
properly pleaded in separate counts.   *The State v. Goodwin*,
33 Kas. 538.   See, also, Max. Cr. Law, p. 187; 1 Whar. Prec.
Ind. 120; 1 Bish. Cr. Proc., 3d ed., §§ 418, 489; Crim. Code,
§§ 121, 122;  Bill of Rights, § 10;  *The State v. Huber*, 8 Kas.
447;  *The State v. O'Kane*, 23 id. 244;  *The State v. Burwell*,
34 id. 312.

2.   The court erred in sustaining a challenge to the juror T.
W. Reed for cause, made by the state, on the ground that he
had served as a juror within a year.   There is nothing in the
record to show that he was drawn by the clerk out of the
jury box as a juror.

3.   The court erred in overruling the defendant's challenge
of the juror Siebert for cause, because of his statement that
he had a prejudice against the defense of insanity arising out
of the excessive use of intoxicating liquors, and also against

a drunkard and the defense of drunkenness. The defendant was compelled to challenge him peremptorily.

4. The defendant's challenge to the array should have been sustained, for the reason that 60 jurors were summoned by the judge, as a panel to try the case, when he had no authority to draw more than 24. Jury Law, § 21.

5. The next error committed by the court relates to the admission in evidence of previous alleged assaults of the defendant on the deceased. To prove these previous assaults, the state introduced the testimony of certain witnesses. We contend that all this evidence was incompetent, because it was in no way connected with the final act. 2 Bish. Cr. Proc., § 628, *et seq.;* 9 Am. & Eng. Encyc. of Law, p. 906. It was a clear violation of the law that forbids proof of one crime by proof of others. 1 Whar. Am. Cr. Law, §§ 321, 347.

These matters were highly prejudicial to the defendant, as they had a direct tendency to influence the minds of the jury against him. The only theory upon which previous assaults are competent is, that they form a part of one comprehensive transaction, beginning with the first assault and ending with the fatal assault. So considered, each forms a link in the chain, and all are proper to be received in evidence as *res gestæ,* to characterize the motive or intent of the defendant. 9 Am. & Eng. Encyc. of Law, 706; *Pound v. The State,* 33 Ga. 88; 2 Bish. Cr. Proc., § 625, and notes.

The witness whose testimony was the most exaggerated and highly colored in the matter in hand, was Hattie Rosier. The court refused to permit defendant's counsel to interrogate this only important witness the state had, as to what the condition of the deceased was with reference to being drunk on the occasion she testified about; refused to allow her to be interrogated as to conversation had about the intoxicated conditions of deceased, with view to impeach her; refused to permit defendant's witness, Mrs. Bartley, to testify to the effect that Hattie Rosier told her so; refused to permit witnesses who testified to prior assaults to be interrogated as to

the defendant's kind treatment of his wife when not intoxicated; and also refused to permit the witness to be cross-examined to the number of times she saw defendant strike deceased. It is a matter of surprise that the court refused to permit the cross-examination suggested. The condition of the deceased in the respect suggested would tend to characterize the transaction and aid in the determining of its nature, whether felonious or otherwise, and the defendant had a right to test the correctness and accuracy of the witness by interrogating her in the way proposed.

6. The next subject-matter concerning which error is predicated is the intoxication of the deceased. The defendant's counsel offered evidence tending to prove that the deceased was, for a year or more prior to her death, in the habit of becoming intoxicated. The court announced a rule that he would admit evidence of the intoxication of the deceased at the times of prior assaults, but no further. The court regarded each prior assault as a different transaction undoubtedly, judging from the rule he announced. In this we think he erred. Each assault must be regarded as part of one enlarged transaction of crime, in order to be admissible in evidence against the defendant. Considered as such for the purpose of the present question, the rule of the trial court is erroneous in not being sufficiently extended. Not only is the condition of the deceased at the time of such prior assaults relevant to characterize the special assault, but habitual intoxication, extending over a period covering all the comprehensive transaction, is relevant for such purpose, and is a more proper method of proof than by particular acts of intoxication. 2 Bish. Cr. Proc., § 617. Where everything depended, as in this case, on circumstantial evidence, it was important to lay the whole transaction before the jury. 2 Bish. Cr. Proc., § 633.

The fact that the deceased was an inebriate would give strength to the theory of suicide or self-destruction, which is but another way of stating that it would tend to show defendant's innocence. The facts would support that theory as

well as the theory of defendant's guilt. Is not alcoholism a parent of suicide as well as crime? See *Blackborn v. The State*, 23 Ohio St. 146.

7. The court permitted several nonexpert witnesses to give evidence of defendant's sanity on rebuttal, over the objection of the defendant. The court's instruction on the subject was also erroneous, because it did not limit the qualification to attendants and intimate friends. Only attendants and intimate friends can give conclusions. 1 Whar. Ev., § 650.

8. The court permitted a series of impeachments to be made of the witnesses John Bartley and Mrs. Bartley, on supposed statements made by them outside of court concerning the guilt of defendant. The point that these witnesses were introduced to prove was, that defendant was an habitual drunkard. So far as the witnesses' testimony was concerned, it was not cross-examined. Neither were the impeaching witnesses asked the same question or concerning the same subject-matter asked the impeached witness.

9. The court erred in refusing to permit the witness Mrs. Pinkston to describe the appearance of the wounds of deceased and to give her judgment as to the cause. The court erred in permitting counsel for the state to interrogate the witness J. H. Lovett as to a statement made by him outside of court, that the defendant was not insane and that he was responsible for his acts, and ought to be hung. Whar. Cr. Ev., § 456. The court erred in not permitting the defendant's counsel to find out the nature of the insult given Mrs. Carpenter, as she claimed, and on account of which she stated she had a dislike for him. *The State v. Krum*, 32 Kas. 372.

10. At the argument, the defendant's counsel desired to read to the jury from certain standard law books and some newspaper items, as part of their argument on the question of insanity and flight. The books were not offered as evidence, but to be used as argument in exhibiting processes of reasoning.

We contend that they were competent for such purposes,

and the refusal of the court to permit counsel to make them a part of their argument was a material error. 1 Whar. Ev., § 625; *Harvey v. The State*, 40 Ind. 516; Whar. Cr. Ev., § 538, and notes.

11. The evidence clearly proved that the defendant had an inherited appetite for intoxicating liquor; that he indulged that appetite, during life; that the habit of drinking grew on him, and within two years prior to the death of his wife a change came over his whole nature, and that he was insane. This evidence raised the subject-matter of alcoholism in all its length and breadth, and made it the duty of the court, to lay the whole thing fully before the jury. The court failed to discharge this duty. The failure vitally affected the defendant, because it was virtually the only plea that he had. It was practically the only shelter, poor as it was, that he had from the cutting, blizzard force of the evidence.

The question of voluntary drunkenness was improperly presented to the jury. True the jury were told that they might consider the drunkenness of defendant as reducing the offense to manslaughter, but such statement was coupled with additional and extraneous matter. There was no single presentation of the subject to the jury. He was entitled to have it singly presented, at least with reference to murder, in each of the degrees. 1 Bish. Cr. Law, §§ 408, 414; 37 Kas. 369.

A fixed insanity indirectly produced by intoxicating liquors, if it fills the law's measure in quantity, is a complete defense to crime, or, better expressed, it relieves from all criminal responsibility. 1 Bish. Cr. Law, § 406, and authorities cited; Browne, Ins., §§ 371–373; 2 Laws. Cr. Def., p. 577, *et seq.*

12. The court laid down what is known as the "right and wrong" test on the question of insanity in the case. In other words, the court below charged the jury that, "if the defendant knew the nature and quality of the act, and that it was wrong," he is responsible. The test leaves no room for the law to expand, in order to meet new cases as they arise in progressive psychological or physical science. There are rec-

ognized phases of insanity that impel the affected to act when he perfectly knows the nature and consequence of the act, and that it is wrong. 1 Bish. Cr. Law, § 387.

This court, in an early decision, held that the defendant was not required to prove insanity by affirmative proof, as a plea in avoidance. *The State v. Crawford,* 11 Kas. 32. If upon the whole evidence there is a reasonable doubt of the defendant's sanity, he must be acquitted.

The case in hand is one of the cases that is not covered by the test. The outbreaks found in alcoholic insanity are uncontrollable. It may be said that such impulses involve an obliteration of the power to know, as well as irresistibly impel to do. While it may or may not be so as matter of fact, it cannot be so said as matter of law. The defendant is entitled to a jury on that question. 6 Am. Rep. 533.

It is true that this court, in *The State v. Nixon,* 32 Kas. 205, and *The State v. Mowry,* 37 id. 369, approved the test, as applied to the facts. But the court says, in *The State v. Nixon,* 32 Kas. 212: "Upon the question of insane, uncontrollable impulse, we do not wish to express any very definite opinions, as we do not think the question is presented to us in this case."

From the statement of facts, the question was not in the other, or, if so, was not argued fully to the court. For a full support of our argument on this head, and a thorough discussion, in all its length and breadth, see *The State v. Pike,* 49 N. H. 399; same case, 6 Am. Rep. 242; *Parson v. The State,* 81 Ala. 577; same case, 60 Am. Rep. 193.

*John T. Little,* attorney general, and *C. M. Clark,* county attorney, for The State; *W. H. Carpenter,* of counsel:

1. The motions directed to the information were properly overruled. The information charges that the deceased died from the mortal wounds, bruises, cuts and contusions inflicted upon her by the defendant. There is but one time alleged in the whole information. There is but one place alleged in the whole information. There is but one death alleged in

the whole information, and that death is alleged to have occurred as the result of all the wrongful acts set out in the information. If several acts are connected with the same general offense, they may be joined in one general count, if committed by the same person at the same time. *Byrne v. The State*, 12 Wis. 519; *Russell v. The State*, 71 Ala. 348; *United States v. Holmes*, 5 Wheat. 412.

The statement of facts connected with and forming part and parcel of the offense will not render the information bad for duplicity, although such facts are complicated and various. *The State v. Edmonson*, 43 Tex. 162; Max. Cr. Proc. 187; Whar. Prec. 145, 147, 148.

2. The court did not err in sustaining a challenge to the juror T. W. Reed. *The State v. Miller*, 29 Kas. 46. See, also, *Mooney v. People*, 7 Colo. 218; *The State v. Shields*, 33 La. Ann. 1410; Jury Law, § 3.

3. The court did not err in overruling the challenge to the juror Siebert. At this point of the trial, no statement had been made to the effect that insanity in any form would be the defense. The questions which defendant claims showed the juror to be disqualified were permissible solely for the purpose of preparing for peremptory challenges. The record of his examination negatives all the defendant alleges as to his disqualification.

4. The defendant's challenge to the array was properly overruled. The presumption is that the court obtained a legal and valid jury, unless the contrary is affirmatively shown. *The State v. Taylor*, 36 Kas. 332; *The State v. Whisner*, 35 id. 279; *The State v. Wright*, 45 id. 136.

5. That evidence of previous ill treatment and assaults is admissible to prove motive and malice, there can be no question. See Whar. Cr. Ev., § 786; *The State v. Watkins*, 9 Conn. 493; *The State v. Green*, 35 id. 203; *McCann v. People*, 3 Park. C. R. 272; *Costley v. The State*, 48 Md. 175; *Stone v. The State*, 4 Humph. 27; *Marler v. The State*, 67 Ala. 65.

6. It is claimed that the court erred in not permitting the defendant to show that deceased was in the habit of becoming

intoxicated. Upon what theory such evidence is admissible, is more than we can see. There is absolutely no authority or precedent for the reception of such evidence in a trial of this kind. The only reason that has been assigned for its reception is, that it tended to prove suicide.

The Ohio case cited by counsel for defendant is not in point. In that case, the defendant offered to prove that, some six years before the death of the deceased, the deceased was known by witness to have made threats of suicide, and that the deceased was at the time predisposed to suicide. It asked the court to exclude this testimony on the ground that it was too remote, and the supreme court stated that this was error.

7. Counsel for defendant claim that the court erred in permitting the witnesses for the state who were nonexperts to give their opinion as to the sanity of the defendant. The authority for the introduction of nonexpert testimony on the point of sanity, after the witnesses have given the facts upon which they based their opinions, is abundant. *Baughman v. Baughman*, 32 Kas. 539. See, also, *Clark v. The State*, 12 Ohio, 483; *Beaubien v. Cicotte*, 12 Mich. 461; *Choice v. The State*, 31 Ga. 434; *Baldwin v. The State*, 12 Mo. 223; *The State v. Clinger*, 46 id. 229; *The State v. Ebb*, 74 id. 199; *Ruthford v. Morris*, 77 Ill. 397; 11 Am. & Eng. Encyc. of Law, p. 162.

8. The witnesses John Bartley and Mrs. Bartley were both called by the state in rebuttal, and substantially the same questions were put to these impeaching witnesses as were put to the impeached witness. We maintain that the record shows that the court did not err in permitting these impeaching questions to be asked.

9. The court properly refused to allow the witness Mrs. Pinkston to give her opinion as to the cause of these wounds, as the witness was not an expert. The witness J. H. Lovett was called for the purpose of establishing defendant's insanity, and swore to facts which, if undisputed, might lead the jury to believe the defendant was insane; therefore the state had a right to interrogate the witness as to whether or not he had

stated that he thought the defendant was of sound mind, as this would tend to dispute the testimony which he had given on direct examination. The witness Mrs. Carpenter stated that she did not care to use the words that defendant had used in insulting her. After witness had made this later statement, the court sustained an objection to inquiring into the nature of the insult. We think this ruling was proper. It is enough that the witness admits that there was a transaction out of which a bias or prejudice arose. *Jordan v. The State*, 79 Ala. 9.

10. Counsel for defendant, in making an argument to the jury, sought to read from certain law books and newspapers, saying that he desired to adopt the same and make it a part of his argument. To this the state objected, and the court sustained the objection. In this the defendant claims the court erred.

It has been held by nearly all the courts that have been called to pass upon the question, that law books and scientific works cannot be introduced in evidence to prove a fact. We cite *The State v. Baldwin*, 36 Kas. 3. Neither can such authorities be used in argument before the jury. *Commonwealth v. Wilson*, 1 Gray, 337; *Washburn v. Cuddihy*, 8 id. 430; *Ashworth v. Kitridge*, 12 Cush. 193; *S. P. R. v. Taylor*, 13 Cox C. C. 77; *Carter v. The State*, 2 Carter, 617; *The State v. West*, 1 Houst. C. C. 371; *Gehrke v. The State*, 13 Tex. 568; *The State v. O'Brien*, 7 R. I. 336; *People v. Wheeler*, 60 Cal. 581; *Boyle v. The State*, 57 Wis. 472; *Bangs v. The State*, 61 Miss. 363; *Yoe v. People*, 49 Ill. 410; 1 Redf. Wills, 145. See, also, *Smith v. The State*, 21 Tex. App. 227; *Pierson v. The State*, 21 id. 14; *Commonwealth v. Austin*, 7 Gray, 51; *Commonwealth v. Murphy*, 10 id. 1; *Curtis v. The State*, 36 Ark. 284.

11. The burden of defendant's eleventh specification of error is, that the court refused to instruct the jury as to insanity resulting from a particular cause. The question raised has been fully considered by this court in *The State v. Mahn*, 25 Kas. 182. We think the court was warranted in refusing

the instructions requested by the defendant on the question of insanity, for the reason that each and every one of them embodied the principle of uncontrollable impulses as being a defense to the crime of murder. The principle has been repudiated by this court time and time again. *The State v. Nixon*, 32 Kas: 205; *The State v. Mowry*, 37 id. 369; *The State v. Yarborough*, 39 id. 581.

Voluntary intoxication is no excuse for crime, even when so extreme as to make the person unconscious of his acts, or to create a temporary insanity. This rule applies to him who is more liable than another to be maddened by liquor. See Desty's Am. Cr. Law, § 26a, and authorities there cited.

12. It is claimed that the court erred in giving its twenty-ninth instruction. In giving this instruction, the court followed almost the precise language that was used by the trial court in *The State v. Nixon*, 32 Kas. 205.

Where the charge is sufficient, and where it is unquestionably established on the trial, and not denied, that the defendant is guilty of the offense charged against him unless he was insane at the time, the only material questions to be considered on appeal to the supreme court are such as relate in some manner to the defendant's sanity or insanity. *The State v. Gould*, 40 Kas. 258.

The opinion of the court was delivered by

HORTON, C. J.: It is contended that the motions challenging the sufficiency of the information should have been sustained. In support of this contention, it is argued that at least three separate death strokes or attacks upon the deceased were alleged in one count, and therefore that the information was bad for duplicity, uncertainty, and want of precision. It is further argued, that if there were separate death strokes or attacks, they should have been charged in different counts of the information ; not in the same count. Under the common-law system of criminal pleadings, the facts alleged in the information ought, perhaps, to have been stated in different counts, but, under the criminal procedure in force in this state,

we think the court committed no error in overruling the motions attacking the information. Section 103 of the code of criminal procedure reads:

"The indictment or information must contain, first, the title of the action, specifying the name of the court to which the indictment or information is presented, and the names of the parties; second, a statement of the facts constituting the offense, in plain and concise language, without repetition."

See, also, § 109, which prescribes the sufficiency of an indictment or information; and also § 110, only authorizing an indictment or information to be quashed for certain defects. The mortal wounds, bruises, cuts and contusions were alleged in the information as having occurred at one time, and although the information stated that each of the wounds was mortal, it concludes as follows:

"Of which mortal wounds, bruises, cuts, and contusions, so received by said Mary O'Neil as aforesaid, and so inflicted upon her, the said Mary O'Neil, by said Hugh O'Neil as aforesaid, Mary O'Neil did then and there instantly die. Wherefore the said county attorney sayeth that said Hugh O'Neil did then and there feloniously, willfully, premeditatedly, deliberately, and with malice aforethought, and with the intent aforesaid, kill and murder the said Mary O'Neil, contrary to the statute in such cases made and provided, and contrary to the peace and dignity of the state of Kansas."

"Even at common law, it may be alleged that the party died of the divers poisons or wounds charged to have been administered or given, without averring that he died of any one of them in particular, for, as it is said, the truth may be that none of them alone, but all together, caused the death." (*The State v. Edmondson*, 43 Tex. 162; Max. Cr. Proc. 187.)

Bishop on Criminal Procedure, § 453, states the rule thus:

"We have seen that, if an offense may be committed by different means, and the pleader doubts which was employed in the particular instance, he may in one count charge its commission by all, and proof of any one will sustain the allegation. The limit to this doctrine is, that the means must not be repugnant."

1. Murder—information— use of different means.

In this case, the means employed to cause the death of the

deceased were not sufficiently repugnant to compel different counts. The first stroke or attack was alleged to have been made upon the head, face and body of the deceased with a blunt instrument; the second, by striking, kicking, beating and choking the deceased, and the third, by throwing the deceased upon the ground and against a stone wall with great force and violence.

It is next contended that the court committed error in the admission of previous assaults of the defendant upon the deceased. To prove these previous assaults, the state introduced the evidence of several witnesses, showing that they were all made within less than a year before the death of the deceased. They were cruel and brutal, and continued down to the time of her death. This evidence was admissible on the question of motive, for the purpose of showing hatred and malice on the part of the defendant. ( Whar. Cr. Ev., § 786; *Sayers v. Commonwealth*, 88 Pa. St. 29; *McCann v. People*, 3 Park. C. R. 272.)

2. Evidence— previous assaults.

In its instructions, the court limited this evidence as follows:

"You are further instructed, that if you find from the evidence the defendant illtreated or abused his wife on occasions prior to the act alleged against him in the information, such acts are relevant to prove motive, and for such purposes only."

It is also contended that the court erred in not permitting further evidence to be given tending to show that the deceased was in the habit of becoming intoxicated. The court permitted evidence of such intoxication at the times of the alleged assaults. There was some evidence introduced of her habits of intoxication, but the court announced that it would not continue such evidence unless connected with the assaults. The deceased, on the 19th of November, 1891, was found upon a sofa or settee in a room in her home, dead, with her head fractured on the right side, her face beaten and bruised, a portion of her nose torn off, an eye injured, her right arm torn, her limbs black and blue, her hair full of weeds and

dirt, and with marks of a thumb and fingers on her throat. William Hendricks testified:

"Ques. Was you working for Hugh O'Neil in November last? Ans. Yes, sir.

"Q. At the time this tragedy occurred? A. Yes, sir.

"Q. You knew his wife, Mary O'Neil? A. Yes, sir.

"Q. When was the last time you saw Mrs. O'Neil alive? A. The last time I saw Mrs. O'Neil alive, she was sitting by the table, crying.

"Q. Where was that? A. At Hugh O'Neil's house.

"Q. When was this that you saw her with reference to the time the body was discovered? A. The day before.

"Q. Where had you been, or where was you when you saw her? A. When I saw Mrs. O'Neil at the table crying?

"Q. Yes, sir. A. When I took in the milk in the morning.

"Q. When was that with reference to the time of breakfast—before or after breakfast? A. That was after breakfast.

"Q. How long after breakfast? A. 10 or 15 minutes.

"Q. Did you see the defendant after you saw Mrs. O'Neil sitting by the table crying? A. I did n't see him until between 10 and 11 o'clock.

"Q. Of that day? A. Yes, sir.

"Q. In the daytime? A. Yes, sir.

"Q. Where did you see him then? A. I saw him out at the north side of the house.

"Q. Was anybody with him? A. Mrs. O'Neil was on the ground.

"Q. In what position was she on the ground? A. Lying on the ground; I could n't tell from where I was whether she was lying on her back or on her side.

"Q. What, if anything, did you see him do? A. He was pouring water on her.

"Q. What was he pouring water out of? A. A wash basin, I guess.

"Q. You may state how long you saw him in that position, and how long you saw him pouring water on her. A. He was not there over two or three minutes.

"Q. What, if anything, did you see him do after he poured the water on Mrs. O'Neil? A. He took her by the arm or the leg, I could n't say which, and took her around the corner of the house.

"Q. How did he take her? A. By the arm or the leg, I could n't say exactly which, from where I was.

"Q. State how he took her: did he lift her up off the ground? dragging her on the ground? A. Yes, sir.

"Q. How far did you see him drag her? A. Just around the corner of the house; I could n't see him any more.

"Q. When did you see Mr. O'Neil next? A. I did n't see anything more of Mr. O'Neil until that evening.

"Q. When you saw him, what was he doing? Go on and state the circumstances. A. When I saw him, he sent one of the children out to tell me to come in, he wanted to see me. I went in, and he sent me to town.

"Q. What time in the evening was that? A. That was in the evening, about 5 o'clock, I guess — pretty nearly sundown.

"Q. What did he send you to town for? A. A pint of whisky and a quarter's worth of baker's bread.

"Q. Did you go to town? A. Yes, sir.

"Q. What time did you return? A. I do n't know; I guess it must have been 9 or 10 o'clock.

"Q. Well, did you see him when you returned? A. Yes, sir.

"Q. What time in the night? A. It must have been between 10 and 11.

"Q. Where did you see him next time? A. Upstairs. ·

"Q. What, if anything, did he say, and what, if anything, did he do at that time? A. Why, I was going upstairs to bed, and he went out of the bedroom. When he went in, he came and asked if the bed was fixed. We told him 'Yes,' and he said we would have to get along with it the best we could, because mamma was awful sick.

"Q. He told you that about 10 or 11 o'clock in the evening, Wednesday? A. Yes, sir.

"Q. Did you see him the next morning? A. Yes, sir.

"Q. What time? A. I guess it must have been about 6 o'clock.

"Q. Where did you see him then? A. Downstairs.

"Q. Did you see him again after that morning — Thursday morning? No, sir; I did n't see him again until I saw him in town.

"Q. After the arrest? A. Yes, sir.

"Q. Now, when did you next see Mrs. O'Neil and under what circumstances? A. The next time I saw Mrs. O'Neil she was in the parlor on the sofa.

"Q. How did you happen to go in there and who was with you? A. Mr. O'Neil's father was with me.

"Q. What time was that? A. It was in the evening— 7 or 8.

"Q. Well, state—did you carry a light and go into the room? A. Yes, sir.

"Q. By what door did you enter the parlor? A. By the outside door.

"Q. When you went in there, did you have a light? A. Yes, sir.

"Q. The old gentleman was with you? A. Yes, sir.

"Q. Where did you go and what did you do? A. I and John Farrell and grandpa [O'Neil's father] took a light from the kitchen, went out through the hall and onto the porch. I and grandpa went in and John stood at the door. He told me to come on with the light, so he could see. I went back with the light, and he raised up the quilt and there she was laying there on the sofa. Grandpa caught hold of her and says 'the poor thing is dead—she is cold.' He then put the quilt back over her.

"Q. Then threw the quilt back over her? A. Yes, sir; and then we left."

John Farrell testified:

"Ques. When did you commence working for Hugh O'Neil? Ans. The 13th of April, 1891.

"Q. Was you working for him at the time this tragedy occurred at his house? A. Yes, sir.

"Q. When was the last time you saw Mrs. O'Neil? A. Friday morning.

"Q. Friday morning of what month and week, if you can remember? I mean when alive. A. Wednesday morning.

"Q. During what month? A. November.

"Q. Last November? A. Yes, sir.

"Q. What week was it? What week with reference to the week you saw her dead? A. The same week.

"Q. Where was she when you saw her Wednesday morning? A. She was getting breakfast in the kitchen.

"Q. In the kitchen? In the house where they lived, in Marion county? A. Yes, sir.

"Q. What time in the morning was it? A. Between 6 and 7 o'clock, I should think.

"Q. Did you eat breakfast at that place that morning? A. Yes, sir.

"Q. State whether or not Mrs. O'Neil was at breakfast. A. No, sir; she was not.

"Q. Who was at breakfast that morning? A. Myself, Will. Hendricks, and Mr. [Hugh] O'Neil, and old Mr. O'Neil.

"Q. That is the father of the defendant? A. I suppose so.

"Q. Anybody else? A. Some of his children; I do not remember whether they were all there or not.

"Q. Do you know where Mrs. O'Neil was during that breakfast hour? A. I think she was in the dining room.

"Q. What makes you think so? A. I saw her go in just when we came in to breakfast.

"Q. That is, as you came in to breakfast, you saw her go into the dining room? A. Yes, sir.

"Q. Now, did you notice the defendant, Mr. O'Neil, eat during the breakfast hour, during the time you ate breakfast there? A. He ate his breakfast.

"Q. Did you see him eat his breakfast? A. I saw him there eating a little.

"Q. Do you know how much he ate? A. No.

"Q. But you saw him eating? A. Yes, sir.

"Q. How long did you eat breakfast? A. 15 or 20 minutes.

"Q. Where did you go to after breakfast? A. I went to the barn.

"Q. How long after that did you return to the house? A. About 12 o'clock.

"Q. Did you see Mrs. O'Neil at that time? A. No, sir.

"Q. Where did you get your dinner that day — Wednesday? A. At Mrs. O'Neil's house.

"Q. What did you do after dinner? A. I shucked corn.

"Q. How soon did you leave the house after dinner? A. I should judge between 1 and 2 o'clock.

"Q. State whether or not you saw the defendant, Hugh O'Neil, at that dinner hour. A. No, sir; I did n't.

"Q. When did you next return to the house? A. About 7 or 8 o'clock; about 7, I suppose.

"Q. That same evening? A. Yes, sir.

"Q. I want to ask you who got dinner that day—Wednesday? A. I think Hendricks did; I am not certain.

"Q. Who seemed to be getting dinner when you was there? A. Bill Hendricks was working around the table.

"Q. What time did you eat supper that evening—Wednesday night? A. About 8 or 9 o'clock.

"Q. Who got supper for you?  A. I did myself.

"Q. Who was there at that time?  A. Me and Mr. O'Neil's father and the children.

"Q. Where was Mr. Hendricks?  A. He was in town.

"Q. Where was Mr. O'Neil?  A. I do n't know—he was in the house, I suppose.

"Q. Did you see him that evening?  A. Yes, sir; I saw him after supper.

"Q. How long after supper?  A. I should judge about half an hour.

"Q. Where did you see him?  A. He came out into the kitchen.

"Q. What, if anything, did he do?  A. He asked if the boy had got back from town yet.

"Q. Well, did you see him any more that night?  A. Yes, sir.

"Q. What time?  A. I do not remember; about 10 o'clock.

"Q. About 10 o'clock?  A. Yes, sir.

"Q. What transpired at that time—10 o'clock?  A. He came out and saw that the boy had got back from town, and the boy gave him the whisky he sent for.

"Q. The boy gave him the whisky that he sent for?  A. Yes, sir.

"Q. Did the boy bring out anything else?  A. Brought out some bread.

"Q. What did Mr. O'Neil say or do at that time?  A. He asked what the whisky come at.

"Q. What response did the boy make?  A. He said, 'It cost a dollar.'

"Q. What did Mr. O'Neil say?  A. He said, 'It comes pretty high.'

"Q. Did you see him again that evening?  A. Yes, sir.

"Q. What time?  A. I do not know exactly what time it was; after we went up to the bedroom.

"Q. Where was it you saw him, and what was he doing?  A. He came into the room afterwards.

"Q. What time did you say that was when he came into the bedroom?  A. I do not know; I think it was pretty near 10 or 11 o'clock.

"Q. What did you see Mr. O'Neil doing at that time?  A. I did n't see him doing anything

"Q. That was Wednesday night?  A. Yes, sir.

"Q. Where was it you saw him?  A. He came into our room after we went into the room.

"Q. Came into the bedroom after you had gone into the bedroom?  A. Yes, sir.

"Q. What, if anything, did he say?  A. Asked how our bed was.

"Q. What did you say to him?  A. Told him it was all right.

"Q. What further did he say?  A. He said we would have to get along with it, for mamma was terribly sick.

"Q. He said you would have to get along with it, because mamma was terribly sick?  Do you know who he meant by mamma?  A. I suppose he meant his wife.

"Q. He generally called her 'mamma'?  A. He generally called her 'mamma;' yes, sir.

"Q. Now that was Wednesday night, between 10 and 11 o'clock?  A. Yes, sir.

"Q. Who awakened you the next morning?  A. Hugh O'Neil did.  He generally got up first in the morning.

"Q. That would be Thursday morning?  A. Yes, sir.

"Q. Who, if anybody, came to your room and awakened you?  A. Mr. O'Neil.

"Q. How soon after that did you see him?  A. When I got down stairs.

"Q. How long was that after you got up?  A. Right away after I got up.

"Q. What, if anything, was he doing at that time?  A. I do not know; he was in the kitchen when I came down stairs.

"Q. Did he say anything to you?  A. Yes, sir.

"Q. What did he say?  A. Told me to hitch up a horse; he wanted to go to town for the doctor.

"Q. Was that all he said to you at that time?  A. Well, he said for me to get breakfast for the children.

"Q. Told you to get breakfast for the children?  A. Yes, sir.

"Q. Did he say anything else?  A. Yes, sir.

"Q. What was it?  A. He told me that he would be back in about an hour and a half.

"Q. What did you then do?  A. Got breakfast for the children.

"Q. Well, you spoke about him asking you to hitch up a horse?  A. Yes, sir.

"Q. Did you do that before or after breakfast?  A. Before breakfast.

"Q. Where did you tie the horse? A. At the gate, south of the house. I suppose it is the south of the house.

"Q. To the gate? A. Yes, sir.

"Q. How far was that gate from the house? A. I should judge about 20 feet.

"Q. Now you say that after you hitched the horse up and tied it there, you went in and got breakfast? A. Yes, sir.

"Q. Did you have any more conversation with Mr. O'Neil there at that time than you have related? A. I believe not.

"Q. Did you hear him say anything to anybody else? A. Yes, sir.

"Q. What did you hear him say? A. He told the little girl not to go into the room where her mamma was, or he would whip her.

"Q. Told the little girl not to go into the room where her mamma was? A. Yes, sir; that she was terrible sick.

"Q. What did he do after saying that to this little girl? A. He went into the dining room and shut the door.

"Q. When did you next see him? A. Next time I saw him was in Florence.

"Q. How soon after that did you see him in Florence? After he was arrested? A. Yes, sir."

After Hendricks, Farrell and the father of Hugh O'Neil found the dead body of Mrs. O'Neil on the sofa or settee in the parlor, they did not disturb it, but sent for Dr. O. B. Whittecar, the coroner. He testified, among other things, as follows:

"Ques. Where do you live? Ans. At Peabody.

"Q. What, if any, official position did you hold last November? A. I was coroner of Marion county?

"Q. On or about the 20th of November last, where were you? A. I was in Peabody.

"Q. Where did you go? A. I was called to Florence by telegram.

"Q. From Florence where did you go? A. I went to what was said to be the residence of Hugh O'Neil.

"Q. Did you go into the house? A. I did.

"Q. Upon your going into the house, what did you discover? A. I discovered the body of a woman upon the sofa or tete-a-tete in the room in the house.

"Q. Describe to the jury, as near as you can, Doctor, the position in which you found that body. A. The body was

lying upon its back, rigid in death, markedly so; lying, as I said, on this short sofa or tete-a-tete. The body was covered with a comfort, entirely up. The woman had her shoes off, dressed in ordinary clothing, and very much disarranged.

"Q. Have you a judgment as to whether that body was placed on that lounge before or after death? A. I have.

"Q. What is your judgment? A. I think it was placed there after death.

"Q. Did you make any examination of the premises? A. I did.

"Q. State what you found, if anything. A. Generally speaking, the house was in a very much disordered condition. Clothing, bedding and household utensils scattered promiscuously all over the house. On what I supposed at that time to be the east side of the house, but which I now think is the north side, because the house does not stand square with the compass, there was a blood stain on the outside on the foundation stone.

"Q. There were marks in dust and dirt on the side of the house? Whereabouts, in relation to the blood spot? A. Immediately over it.

"Q. Go on and describe the size of the blood spot, where it was, in relation to the ground and in relation to these prints that you saw on the side of the house. A. The blood stain on the foundation stone was immediately below the marks on the side of the house. The size of that blood stain, if remember correctly, was about three inches long by an inch to an inch and a quarter wide. It was of a dark color, apparently made from venous blood.

"Q. What, if any, else did you discover there on the front porch leading up to this room? A. I made no discovery. The discovery was pointed out to me, as made by others.

"Q. What was that? A. Members of my jury pointed out to me hair resembling in color the hair on the head of the deceased lady. This hair was found in the splinters of one of the steps leading up the porch, in the ends of the boards of the porch, and was pointed out to me.

"Q. Did you make a comparison between the hair that you found there at that time and the hair in the head of the deceased? A. I did.

"Q. State what, if any, similarity there was. A. They were identical in color, length, and general appearance.

"Q. Do you know the condition of the hair of the de-

ceased at the time you was there in November last?    A. I know as I saw it.

"Q. What was that condition?    A. The hair was very much disarranged and tangled and full of dirt and straw, several pieces of straw and other grass around there; several pieces of weeds, cinders, coal cinders and one or two sand burs were in the hair."

After O'Neil left his home, on Thursday morning, November 19, he went to Florence, boarded the train, and was arrested at Cottonwood Falls on Friday, the 20th.    From this and other testimony in the record, the claim that evidence of the intoxication of the deceased would have supported the theory of her suicide is not tenable.    Evidence of suicide was wholly wanting.    Counsel for defendant seem to admit this, for in their brief they say, speaking of the defendant's inherited appetite for intoxicating liquors, that the failure of the court to instruct as requested upon this matter " vitally affected the defendant, because it was virtually the only plea he had.    It was practically the only shelter, poor as it was, that he had from the cutting, blizzard force of the evidence." Of course, in some cases, the intoxication of the deceased would be very important, and it would· be fatal error to reject such evidence.    In this case, the limit fixed by the court in the introduction of such evidence was not prejudicial.

It is further contended, that the court committed error in not permitting defendant's counsel in their argument to read to the jury from law books and newspapers upon the question of insanity and flight.    This court has already held that scientific books "cannot be admitted to prove the declarations or opinions which they contain."    (*The State v. Baldwin*, 36 Kas. 1.)    Wharton says that

"In an argument to a court, such works may, at the discretion of the court, be read, not as establishing facts (unless such books are regarded as matters of notoriety, as are ordinary dictionaries), but as exhibiting distinct processes of reasoning which the court, from its own knowledge as thus refreshed, is able to pursue.    But if read to establish facts, capable of proof by witnesses, such books cannot be received.    Medical

works, consequently, are inadmissible for the purpose of proving the facts they contain." (Crim. Ev., § 538.)

In *Legge v. Drake*, 1 Ohio St. 287, it is said:

"It is not to be denied but that a pertinent quotation or extract from a work on science or art, as well as from a classical, historical or other publication, may, by way of argument or illustration, be not only admissible (in argument), but sometimes highly proper. And it would seem to make no difference whether it was repeated by counsel from recollection or read from a book. It would be an abuse of this privilege, however, to make it the pretense of getting improper matter before the jury as evidence in the cause."

3. Reading books to jury.

A part of the excerpts attempted to be read conflicted with certain instructions of the court. The court therefore, under all the circumstances, committed no error in refusing to permit the law books and newspapers to be read to the jury. The counsel for the defendant, however, in their arguments, repeated from recollection very much of the language contained in the rejected law books and newspapers, and the only complaint really is that they were not permitted to impress the jury more forcibly with the authorities from which they quoted.

The more serious questions discussed in the briefs and in the oral argument concern the instructions about drunkenness and insanity. Evidence was offered upon the part of the defendant showing that he had inherited an appetite for intoxicating liquors; that he indulged that appetite during life; and that the habit for drink had grown upon him, so that he had the reputation of being a habitual drunkard. It is further insisted the evidence tended to prove that, at the time of the death of the deceased, the defendant was insane from alcoholism. The following instruction was requested on the part of the defendant and refused by the court:

"If you believe there is a disease called dipsomania, being an inordinate, uncontrollable appetite for intoxicating drink, and if you further believe from the evidence that the defendant, by long-continued and excessive indulgence in alcoholic

liquors, brought upon himself such disease, and that the same had so impaired his mental faculties and his power over his will as to render him subject to furious and uncontrollable impulses to assault and slay his wife, but he did not at the time understand the nature and consequence of such act and that it was wrong, he is not guilty of any of the offenses charged or included in the information."

The court, however, instructed the jury, among other things, as follows:

"Voluntary intoxication is no defense to murder in the first degree unless such intoxication should be so extreme as to rob the mind of the power of premeditation and deliberation. Hence, in this case, if you find that the defendant committed the act of killing as charged in the information, and that at the time he did so he was in a state of intoxication caused by his voluntary action, he is guilty of murder in the first degree, unless you further find that such intoxication was so extreme as to prevent his mind from the exercise of deliberation or premeditation; in which latter case he would be guilty of murder in the second degree, or manslaughter in some of the degrees as you are herein instructed.

"I instruct you that, if you believe from the evidence, beyond a reasonable doubt, that the defendant did the killing of Mary O'Neil, as charged in the information, but at the time he was so drunk as to be incapable of entertaining deliberation and premeditation, also was incapable of entertaining the elements of purpose and malice, and that the defendant had no previous knowledge that when intoxicated he was liable to commit acts of violence upon his wife or others, as a consequence of such drinking, you cannot find the defendant guilty of murder in either of the first or second degrees.

"I instruct you that, where a person is shown to have been in the habit of becoming intoxicated, and it is further shown that when intoxicated he is apt to commit acts of violence upon his fellows and endanger their lives or safety, and such person is shown to have knowledge of such fact, and, having such knowledge, voluntarily becomes intoxicated, then and in such a case such person would be as fully and entirely responsible for acts of a criminal nature committed by him while in such state of intoxication as though the act had been committed by him while not intoxicated. Hence, if you believe that the defendant in this case was in the habit of becoming intoxi-

cated, and that while in such state of intoxication, and by reason thereof, was apt to and did assault and beat Mary O'Neil, his wife, in a manner dangerous to her life and safety, and if you further find that the defendant knew that he was apt to assault and beat his wife while so intoxicated, but notwithstanding such knowledge voluntarily became intoxicated, and while so intoxicated assaulted his wife and killed her as charged in the information, then I instruct you that the defendant is guilty in the same degree as he would be had he committed the act while not intoxicated."

This court has already declared, in accordance with the views adopted generally by other courts, "that if a man kills another while in a fit of voluntary intoxication,

4. Intoxication as a defense. it is murder, and he must suffer the penalty."
(*The State v. Yarborough,* 39 Kas. 581; Laws. Insan. 532–695, and cases cited. Of course drunkenness may be considered, as the instructions declare in this case, in

5. Deliberate premeditation—intoxication—evidence. determining whether there was that deliberation, premeditation and intent to kill necessary to constitute the offense charged. (*Cline v. The State,* 43 Ohio St. 334.) Bishop, in his work on Criminal Law, which is quoted approvingly in the brief for the defendant, says:

" When a man voluntarily becomes drunk, there is the wrongful intent; and if, while too far gone to have any further intent, he does a wrongful act, the intent to drink coalesces with the act done while drunk, and for this combination of act and intent he is liable criminally.   It is, therefore, a legal doctrine, applicable in ordinary cases, that voluntary intoxication furnishes no excuse for crime committed under its influence.   It is so even when the intoxication is so extreme as to make the person unconscious of what he is doing or to create a temporary insanity." (Vol. 1, § 400, 7th ed., p. 258.)

In § 406, he says:

"Again, the law holds men responsible for the immediate consequences of their acts, but not ordinarily for those more remote.   If, therefore, one drinks so deeply, or is so affected by the liquor, that, for the occasion, he is oblivious or insane, he is still punishable for what of evil he does under the in-

fluence of the voluntary drunkenness. But, if the habit of
drinking has created a fixed frenzy or insanity, whether per-
manent or intermittent — as, for instance, *delirium tremens* —
it is the same as if produced by any other cause, excusing the
act. For whenever a man loses his understanding, as a settled
condition, he is entitled to legal protection, equally whether the
loss is occasioned by his own misconduct or by the dispensa-
tion of Providence." (7th ed., § 406.)

If drunkenness produces insanity, through *delirium tremens*
or *mania a potu*, or other disease, and a defendant at the time
of the homicide has no sufficient capacity or reason to enable
him to determine between right and wrong as to the particu-
lar act he was doing, or has no power to know that the act was
wrong and criminal, he would not be responsible. (*O'Grady
v. The State*, 54 N. W. Rep. [Neb.] 556.) In cases of *delir-
ium tremens* or *mania a potu*, the insanity excuses the act,
the frenzy being, not the immediate effect of indulgence in
strong drink, but a remote consequence superinduced by ante-
cedent drunkenness. (*The State v. Nixon*, 32 Kas. 205; *The
State v. Mowry*, 37 id. 369; also, the various decisions cited
in Lawson on Insanity, pp. 532–680; *O'Grady v. The State*,
supra; *Cline v. The State*, supra.)

But it is argued, on account of the instructions given and
refused, that the jury were misled in not being permitted to
excuse the defendant, if alcoholism or other disease had created
insanity. We think other instructions of the court sufficiently
covered all forms of insanity, because in such instructions the
jury were informed that,

"When insanity is set up as a defense to crime committed,
the rule that the jury must ever keep before their eyes and
minds in determining the responsibility of defendant's in this :
'Was the accused, at the time of doing the act complained
of, conscious of the nature of his act, or did he know that
it was wrong to do it?' . . . Testimony has been in-
troduced in this case covering several years of the defend-
ant's life prior to the commission of the acts alleged against
him. The object was to show the defendant's conduct and
habits of life. This is all proper testimony, and you should
consider it for what you may think it is worth as bearing

upon the question of the defendant's sanity or insanity at the
time he committed the act charged against him.  If you find
that he did commit such an act, remembering that it is the
condition of the defendant's mind at the time he committed
the fatal assault upon which you are to judge him, and that
all or any of this testimony is only competent as it may
throw light upon his actual condition at the time of his com-
mission of the act charged against him.  .  .  .  If you be-
lieve that the defendant was laboring under such a defective
reason from disease of the mind as not to know the nature
and quality of the act he was doing, or, if he did know it,
that he did not know that what he was doing was wrong,
then the law does not hold him responsible for his acts.
.  .  .  When habitual unsoundness of mind is once shown
to exist, either wholly or partially, it is presumed to continue
to exist until the presumption is rebutted by the state.  .  .
When a person, at the time of the alleged crime, has suf-
ficient mental capacity to understand the nature and quality
of the particular act or acts constituting the crime, and the
mental capacity to know whether they are right or wrong, he
is responsible, if he commits such act or acts, whatever may
be his capacity in other particulars; but if he does not possess
this degree of capacity, then he is not so responsible.  In
other words, if he has mental capacity sufficient to distinguish
between right and wrong with respect to the particular act or
acts constituting the alleged crime, he should be held respon-
sible for the commission of such act or acts, although he
might be insane or imbecile with respect to other matters.
Now, there are many sorts of diseases of the mind that are
commented upon and discussed by physicians and psycholo-
gists in these days, and that are presented in court for the
consideration of a jury, and upon which the jury is asked to
find that the mind of the accused was, at the time in ques-
tion, so overthrown as to make him wholly irresponsible,
and, therefore, that he should be acquitted for his otherwise
unlawful acts.  Now, however varied these diseases may be,
I say to you they all come under the great head or generic
head of insanity, and in the main test is the rule I have just
given you; all else is argument or minor rule under this
head, and which must resolve itself back to it."

Therefore, in accordance with the prior decisions of this
court, the jury were properly instructed upon the evidence

concerning the defendant's insanity, whether caused from alcoholism, through *delirium tremens*, or *mania a potu*, or from any other disease.

This court has gone further than some other courts in holding

"That the defendant on a plea of insanity is not required to establish his insanity by a preponderance of the evidence, but if, upon the whole of the evidence introduced upon the trial, together with all the legal presumptions applicable to the case, under the evidence there is a reasonable doubt whether he is sane or insane, he must be acquitted. To doubt his insanity is to doubt his guilt; and to doubt his guilt (if the doubt be a reasonable one) is to acquit. The doubt of guilt cannot be of less degree than the doubt of sanity, and if the doubt of sanity be a reasonable doubt, the doubt of guilt must also and necessarily be a reasonable doubt." (*The State v. Crawford*, 11 Kas. 32.)

The rule laid down by this court concerning the responsibility of a "person who, at the time of the commission of the alleged crime, has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong," is forcibly challenged by the counsel for the defendant.

The theory of irresponsibility from an irresistible or uncontrollable impulse is ably presented. The following authorities are cited against the law declared in the former decisions of this court: *The State v. Pike*, 49 N. H. 399; same case, 6 Am. Rep. 242; *Parson v. The State*, 81 Ala. 577; same case, 60 Am. Rep. 193. We have also been referred to a lengthy article "On the Legal Aspect of Insanity," published in vol. 1, N. W. Law Review, 1, which states, among other things, that "it would be difficult to crowd into the same compass more erroneous ideas than are found in the charge of the court in the Guiteau case, 10 Fed. Rep. 161." We have examined these authorities, and also read many similar articles in the magazines upon legal or forensic medicine which support and even go further than the views expressed in the law

review. Some of the articles in the medico-legal journals assert that all crime results from heredity, and therefore that all persons committing alleged offenses should be considered irresponsible, and be subjected to treatment for disease only, not for crime. The decisions cited above are sporadic cases, and against the overpowering weight of authority. (Lawson, Insan. 200–324.)

Mr. Justice VALENTINE, in *The State v. Nixon*, 32 Kas. 205, expressed himself as follows:

"It is possible that an insane, uncontrollable impulse is sometimes sufficient to destroy criminal responsibility, but this is probably so only where it destroys the power of the accused to comprehend rationally the nature, character and consequences of the particular act or acts charged against him, and not where the accused still has the power of knowing the character of the particular act or acts, and that they are wrong. Indeed, it would seem dangerous to society to say that a man who knows what is right and wrong may nevertheless, for any reason, do what he knows to be wrong without any legal responsibility therefor. The law will hardly recognize, the theory that any uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby relieve him from all criminal responsibility. Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it, if in fact he does commit it. But upon this question of insane, uncontrollable impulse, we do not wish to express any very definite opinions, as we do not think the question is presented to us in this case."

6. Mental capacity—responsibility for acts.

In *The State v. Mowry*, 37 Kas. 369, this court adopted the views thus expressed upon uncontrollable impulse. See *The State v. Miller*, 20 S. W. Rep. (Mo., 1892) 243, where the defendant was charged with rape, and claimed he was irresponsible for the crime because committed under uncontrollable impulse. (27 Am. Law Rev. 299, 300.) We are not willing to change the ruling of this court in favor of irresponsibility on account of uncontrollable impulse, where the perpetrator is fully conscious that the act he is doing is wrong

and criminal.   If the law as declared by this court does not offer sufficient safeguards and protection for "that most unfortunate class, who cannot speak for themselves," an act of the legislature may establish a different rule.   Until the legislature interferes, we prefer to follow the great weight of authority upon this matter.   We are not inclined to adopt the theories of psychological enthusiasts to overthrow the long-established criminal practice in this class of cases, which is based on human experience from earliest .times.   The legislature might, however, very appropriately pass an act permitting the state or the accused to have the question of insanity tried before the main trial upon the information or indictment.   In such a case, a jury of physicians might be required to be summoned to determine the sanity or insanity. At present, the question of insanity in a criminal case, where it is claimed that the accused was insane at the time of the commission of the alleged offense, is tried along with all the other questions.   (*The State v. Gould,* 40 Kas. 258.)

Several other alleged errors are referred to and discussed in the briefs.   All of these have been examined, but we find no prejudicial error therein.

The judgment of the district court will be affirmed.

All the Justices concurring.