STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GARY S. MAIK, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 23, 1971—Decided May 4, 1971.

Before Judges KILKENNY, HALPERN and LANE.

*Mr. Harold C. White,* Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Alfred M. Bitting,* Assistant Prosecutor, argued the cause for respondent (*Mr. Dominick J. Ferrelli,* Burlington County Prosecutor, attorney).

The opinion of the court was delivered by
KILKENNY, P. J. A. D. On June 12, 1970 defendant was found guilty by a jury of murder in the second degree

(*N. J. S. A.* 2A:113–2). He was sentenced to the New Jersey Reformatory for an indeterminate term, but the sentencing judge imposed a maximum of 25 years. *N. J. S. A.* 30:4–148.

On this appeal defendant contends: (1) the trial court erred in its charge on legal insanity and the availability of this defense; (2) a remark made by the prosecutor in his opening was so prejudicial that it deprived defendant of his right to remain silent; (3) evidence of the use of drugs by defendant should not have been submitted to the jury on the question of defendant's guilt; (4) the court erred in denying defendant's motion for a judgment of acquittal, and (5) the trial court erred in its answers to the jury's questions during its deliberations.

There was evidence from which the jury could reasonably find the following facts.

On October 18, 1969, at approximately 11:30 P.M., the body of John Tomlinson was found lying face down outside a service station in Bordentown. The victim had been stabbed numerous times. A large hunting knife was found next to the body.

The overwhelming evidence presented by the State established that defendant was the one who had caused the death of John Tomlinson. One of the victim's shoes was found in an automobile used by defendant; the victim's blood was in the car and on defendant; the two were together earlier that evening and purchased knives, and defendant admitted to Patrolman Burke that, "This guy was murdered," and "It is a stabbing," and "I did it." Moreover, defendant made no effort to deny commission of the act. Rather, his entire defense was premised upon his mental incapacity when the homicide occurred.

There was testimony as to defendants family history and personal background. Defendant was just 24 years old at the time of the trial on June 10, 1970. He was the second oldest of five children. His father was a musician and teacher. Between the ages of one and eleven defendant and

his brothers had lived in 26 different places. His parents' marriage was extremely "incompatible." They were separated numerous times when he was young and were finally divorced in 1959. His mother had a psychiatric history and was institutionalized a number of times. Defendant was placed in an orphanage on occasion when she was confined. His mother often inflicted physical punishment upon him, striking him with her hand, a broom, or a frying pan. Gary's older brother, Kenneth, testified as to the family life, summing it up in these words, "* * * to make a long story short we just grew up in a reign of terror and insanity."

This older brother Kenneth, according to the father's testimony, had received a medical discharge from the Navy. After four months of service he had "an emotional breakdown," was transferred to the Naval Hospital in Philadelphia and was confined for four months in the psychiatric ward. He was found to be not adjustable to military life and discharged.

Defendant's father also acknowledged that he had sought psychiatric help for himself about 1948–1949 and had six visits with a Dr. Zigarelli in Paterson as the result of a court recommendation. However, defendant had not undergone any psychiatric help prior to the incident on October 18, 1969.

During the summer of 1969 defendant and his brother Kenneth were residing in their own apartment in Trenton. Gary was attending Trenton State College as a junior. His personality began to change noticeably. He became more extrovert in his manner and concerned himself with many philosophical pursuits. During the late summer he had experimented with narcotics. He told his brother Kenneth that he had taken "pot a couple of times * * * pot or marijuana." He also mentioned "LSD, that he took." Kenneth became frightened and called Skillman Neuropsychiatric Hospital, obtained the name of a Dr. Jack Ward and explained the problem to the doctor. Later he went with Gary to see Dr. Ward. In that same summer defendant had an

unsuccessful romance with a young lady who resembled his mother.

Three psychiatrists and a psychologist testified as experts on behalf of defendant, and one psychiatrist testified in rebuttal for the State. Significantly, all of the experts agreed that, in all probability, defendant was "legally insane," not knowing the difference between right and wrong, and was in a psychotic state on the day the homicide was committed. He had related that he believed that he and the victim were being pursued by a narcotics ring.

The experts opined that defendant was a latent schizophrenic and that an event or series of events could have triggered the psychosis. All agreed that his experiences with drugs may have been a dominant factor in precipitating the insanity — defendant's experts emphasizing LSD and the State's expert stressing marijuana or "hashish." They all felt that his romantic encounter may have contributed but was not traumatic enough to be significant.

At the end of the testimony defendant made a motion for a judgment of acquittal, which was denied.

I

Was the trial court's charge with regard to legal insanity and the availability of that defense to defendant erroneous? The challenged instruction to the jury was as follows:

Therefore, if you conclude from the evidence that the defendant Gary Maik did kill John Tomlinson on the night of October 18, 1969, but that at the time of the killing, Gary Maik was temporarily insane, and further that his temporary insanity was triggered or precipitated by his voluntary use of LSD and/or Hashish, and its reaction on his mental condition which was predisposed to weakness, *then that defense of temporary insanity is not available to this defendant and he is still responsible for his criminal conduct.* [Emphasis added]

██ We deem that instruction erroneous. If defendant were temporarily "legally insane" when he committed the killing, he is not criminally responsible for his act. The

unanimous opinion of all the medical experts, for defendant and the State, was to the effect that defendant was legally insane when he killed Tomlinson. Thus, we do not have here conflicting testimony which required resolution of that issue by the jury.

We adhere to the *M'Naghten* rule, see *State v. Lucas*, 30 *N. J.* 37, 68 (1959), and *State v. Di Paolo*, 34 *N. J.* 279, at p. 291, under which legal insanity requires that (1) by reason of a defect of reason due to disease of the mind, (2) the accused did not know the nature and quality of the act he was doing, or did not know it was wrong. [*State v. Trantino*, 44 *N. J.* 358, 367 (1965)]

 The trial judge confused a killing by a legally insane person with a killing by a person whose mental operations have been impaired by voluntary intoxication or use of drugs. In the former, legal insanity is a defense. In the latter, the voluntary intoxication by alcohol or other drugs is not a defense, but it may be shown to mitigate the degree of the crime. The distinction is pointed up in *State v. White*, 27 *N. J.* 158 (1958), wherein the court said:

The general rule is that the voluntary use of drugs, like the voluntary use of alcohol, is not a defense to murder (*in the absence of mental disease resulting therefrom*), although in some situations it may be pertinent with respect to the degree of that crime by negating the existence of the specific intent to kill [at 165; emphasis added]

Noteworthy and applicable herein is the statement above in parentheses. See *Schlosser, Criminal Laws of New Jersey* (1970), § 4:70.

 If defendant was in fact "legally insane" at the time of the offense, his insanity was a defense, even though his prior use of drugs may have triggered or precipitated an underlying psychosis. The trial judge's instruction would have recognized a new concept of "voluntary insanity," thereby whittling away the defense of "legal insanity." To hold otherwise would be to visit criminal responsibility upon a person who did not know, by reason of a defect due to dis-

ease of the mind, (1) the nature and quality of the act he was doing, or (2) did not know it was wrong. It has been clearly stated that, if at the time of the killing, the accused, by reason of temporary "insanity" was incapable of distinguishing between right and wrong with respect to the act, he is not guilty of the crime. *State v. Lynch,* 130 *N. J. L.* 253, 257 (E. & A. 1943).

The awesome details of the killing add support to the uncontradicted medical opinions that defendant was legally insane at the time of the killing. The victim was a friend, a fellow student at Trenton State College. They had been together from 6 P.M. on the fatal evening. There were in excess of 60 stab wounds.

In *Commonwealth v. McGrath,* 264 *N. E.* 2d 667 (Mass. Sup. Jud. Ct. 1970), it is stated broadly that in instruction in a murder prosecution, that the defense of insanity was not available to defendant if the jury found the insanity was caused or induced by his voluntary use of drugs or alcohol, was not erroneous. We do not subscribe to that broad language. There are also distinguishing facts in that case. There, defendant's insanity was in issue. One expert testified that there was no evidence of mental disease. There was other testimony in that case of the party's having taken drugs on the day of the murders. In our case there was no proof that defendant was under the influence of drugs voluntarily taken at or shortly before the homicide. His insanity at the time of the offense is conceded by all. His diseased mind having been caused, at least in some measure, by the prior voluntary use of drugs, should not make him criminally responsible for an act whose quality was unknown to him and which he did not know was wrong when he committed it.

## II

The trial court also erred in denying the motion on defendant's behalf for a judgment of acquittal by virtue of his insanity at the time of the homicide. Here, the State's

expert agreed with defendant's experts as to defendant's insanity at the time of the act. In the light of the uncontroverted testimony as to defendant's insanity, the motion for a judgment of acquittal should have been granted under R. 3:18–1. See *State v. Reyes*, 50 *N. J.* 454, 458 (1967), for the test to be applied in passing upon such a motion.

## III

In view of our determinations above, it becomes unnecessary to consider defendant's other three points. Suffice it to say, defendant's third and fourth points lack substantial merit. The remarks of the prosecutor in his opening did not deprive defendant of his right to remain silent. He did remain silent. The trial judge offered to make curative instructions, which offer was refused by defense counsel. See *Commonwealth v. Lowery*, 440 *Pa.* 361, 269 *A.* 2d 724 (Pa. Sup. Ct. 1970). As to the evidence of the use of drugs by defendant, this was adduced by the defense from its own witnesses, lay and expert.

As to the fifth point, the trial court's additional instructions in answers to the jury's questions contained some error for the same reasons expressed under I, *supra*.

The record discloses that there was a pre-trial sanity hearing on April 24, 1970 to determine defendant's fitness to stand trial. He had been admitted to the New Jersey State Hospital for the Criminally Insane on October 20, 1969 and discharged on April 11, 1970 to await trial. The determination that he was fit to stand trial does not derogate from the conclusion that he was legally insane some eight months earlier, approximately, when the killing occurred.

The judgment of conviction is reversed and the matter is remanded to the trial court for a determination as to whether defendant's insanity at the time of the commission of the offense continues and, if it does continue, the court shall order him into safe custody and commit him to the

New Jersey State Hospital at Trenton until such time as he may be restored to reason. *Cf. N. J. S. A.* 2A:163–3. If defendant is found to be sane at this time, he should be discharged.