319 So.2d 725

George **JOHNSON**

v.

**STATE.**

**5 Div. 304.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

CLARK, Supernumerary Circuit Judge.

Appellant was convicted and sentenced to imprisonment for life for murder in the first degree of Mrs. Orlean McCord.

The victim, an elderly lady, was living alone at Goodwater. On September 1, 1974, she was expected .for a noon meal at the home of her son and family, who also lived in Goodwater. Upon her failure to arrive for the meal by about 12:30 P.M., her son and wife became concerned and telephoned a young man to meet them at the victim's home, where they promptly went, accompanied by one of their neighbors. The front and back door of the victim's residence were locked. Neighbors of the victim, becoming alerted to the situation, were on hand. The young man who had been called arrived, obtained a step ladder from a neighbor of the victim and entered the house through the only open window therein. There was a screen missing from the window. He unlocked the doors, through which the concerned friends of the victim, and afterwards law enforcement officers, entered. According to their testimony, Mrs. McCord was then a cold corpse, lying on the floor near her bed. She was dressed in pajamas upon which were blood smears across the shoulder, back and bottom. Blood stains were on the pillows of the bed. A vase in the room had been broken, and pieces of it were found on the floor and on the bed.

The body was taken by ambulance to Auburn, where it was examined by a toxi-

---

Tom R. Ogletree, Sylacauga, for appellant.

William J. Baxley, Atty. Gen., and Carol Jean Smith, Asst. Atty. Gen., for the State.

cologist of the State of Alabama. He found bruises and contusions, the left sixth rib fractured, two fractures of bones in the neck area and hematoma of the sub-scalp area. He concluded that her death was the result of manual strangulation.

The screen that was missing from the window through which the entry was made into the house was found under the house of Charles Smith, a life-time acquaintance of appellant. Finger prints were obtained from the frame of the screen by a criminologist employed by the Department of Toxicology and Criminal Investigation, who compared them with finger prints of appellant. He testified there were matching characteristics. He said, "In my opinion both prints were made by the same finger."

Charles Smith, whose home is located about a hundred yards from that of Mrs. McCord, testified as a witness for the State. He said appellant stayed at his home from sometime on the afternoon of August 31, 1974, until about 3:30 A.M. on the morning of September 1. During that time they had looked at television. He said that appellant was away from the house from about 3:30 A.M. until about 4:30 A.M. Upon his return appellant told the witness that he was going to sleep outside in the car. The witness said he saw appellant again about 10:00 A.M. that morning. He said appellant was wearing a red shirt, "a black pair of pants and black shoes," that he was with the witness from the afternoon of August 31, 1974, until about 3:30 A.M. the following morning, but that he had changed clothes when he was seen at 10:00 A.M. that morning, at which time he had on a "blue and white shirt, a blue pair of pants and a black pair of shoes." The witness said he did not put under his house the screen that was found thereunder and that he had never seen it prior to September 1, 1974.

Three witnesses for the State testified as to conversations with appellant in the Coosa County Jail in March, 1975. One said appellant told him that he had gone to Mrs. McCord's home to "rip her off," that there was someone else with him, but that he did not tell this to his lawyer. Another said that appellant stated that he killed Mrs. McCord and "busted her across the head with a jar." The third witness as to a conversation with appellant said that he stated that "he killed Mrs. McCord along with another fellow named Charles."

Appellant did not take the stand.

There were two pleas in the case, not guilty and not guilty by reason of insanity.

■ We have no difficulty in concluding, and no insistence is made to the contrary, that there was ample evidence to support the verdict of the jury as to the issue raised by the plea of not guilty.

As to the issue raised by the plea of not guilty by reason of insanity, we hereinafter summarize testimony not narrated above.

Expert testimony on the subject of insanity was largely in favor of defendant, but there was some conflict. In October following the death of Mrs. McCord, upon joint motion of the State and defendant for an investigation as to the sanity of defendant, he was sent to the Superintendent of the Alabama State Hospitals and there he was examined and considered by two psychologists, a licensed physician with training in psychiatry and two psychiatrists. All but one of the psychiatrists, agreed substantially in the determination that defendant was moderately mentally retarded, that according to the Binet Test he had a mental age of approximately six years, that according to the Leitner International Test he had approximately the same mental age and that according to the Ammons Picture Vocabulary Test, (considered as a less valid test, because "it tests pretty much rote memory") he had a mental age of about nine years. They rated his IQ as between 35 and 50. They were in general agreement that he did not know right from wrong. One indicated that he probably acted from an irresistible impulse.

The non-concurring psychiatrist was not as positive in his views. He said that he considered that defendant had mild mental retardation, but that he did not see anything psychotic about him, that he was probably fearful and under some pressure, but that he knew right from wrong.

Appellant was 26 years of age at the time of the crime. The only evidence as to his school record was that he had been a "slow learner"; that he had "progressed as far as the ninth grade, but he hadn't done very well, and his reading was barely adequate to make it that far."

The lay testimony on the issue of defendant's insanity was all in favor of the State, but it was limited to testimony by the sheriff of Coosa County, the chief of police of Goodwater and a policeman of the Goodwater Police Department. Each testified that he considered defendant sane. The sheriff had observed him in jail, while he was making long distance phone calls, playing cards and looking at magazines. The Chief of Police of Goodwater had observed defendant playing pool and on the streets; he had known him for four and one-half years and had seen him nearly every week; he had never observed any abnormal or unusual behavior by defendant. Officer Strong of the Goldwater Police Department had known defendant about twenty years; he had worked at a sawmill with defendant while defendant was stacking lumber and running the chipper; he had talked with defendant on many occasions, had visited in his home and defendant had visited in the witness' home; he had never seen him acting abnormally.

■ Notwithstanding the changes in some other jurisdictions, and the many suggested changes in substantially all jurisdictions, of the rule that sets forth the mental capacity to commit a crime,[1] the Alabama rule is still that *M'Naghten's*

*Case,* 8 Eng.Rep. 718 (H.L.1843) as supplemented by *Parsons v. State,* 81 Ala. 577, 2 So. 854 (1886), that a person of requisite age is mentally capable of criminal conduct unless his mind is so diseased that either he cannot distinguish between right and wrong as to the particular offense in question or he cannot resist an impulse to commit such offense if solely produced by his mental disease. We are not authorized to change that rule. Applying it here, the verdict of the jury was well within its province. Even if we were disposed to reach a different determination, which we are not, such action would be out of harmony with the established legal policy that has been frequently and uniformly followed in Alabama since *Parsons v. State,* supra, recently cited with approval in the majority and dissenting opinions in *Seibold v. State,* 287 Ala. 549, 253 So.2d 302 (1970) and more recently in *Smith v. State,* 54 Ala.App. 237, 307 So.2d 47 (1975) and *Cunningham v. State,* 54 Ala.App. 514, 310 So.2d 235 (1975). In *Smith v. State,* the court quoted from *Boyle v. State,* 229 Ala. 212, 222, 154 So. 575, 583 as follows:

"'[C]ourts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused.'"

In *Boyle v. State,* is contained almost all the testimony of then prominent physicians and is much stronger for defendant than testimony in the case before us. Unlike *Boyle,* we see no "grave question presented on this appeal . . . whether the defendant was due an affirmative instruction on his plea of 'not guilty by reason of insanity.'" Like *Boyle,* we are affected by

---

1. A valuable treatise on the subject is Professor M. Gardner's *Criminal Responsibility and Exculpation by Medical Category—an Instance of not Taking Hart to Heart.* 27 Ala.L.Rev. 55 (1975).

the same statute now codified as Code of Alabama 1940 Title 15, Section 422 as follows:

"Every person over fourteen years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."

Our review of the record pursuant to the provisions of Title 15, Section 389, Code of Alabama 1940, fails to convince us that there is any prejudicial error therein. We note, however, the possibility of reasonable ground to doubt the sanity of accused so as to make applicable Code of Alabama 1940, Title 15, Section 426, mandating, in that circumstance, a separate jury determination of his mental competence to stand trial. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; *Pierce v. State,* 52 Ala.App. 422, 293 So.2d 483; *Edgerson v. State,* 53 Ala.App. 581, 302 So.2d 556. Whether a determination was made by the trial judge as to the question of the existence of a reasonable ground to doubt defendant's sanity, the record leaves us without a compass. The record is completely silent on the subject. As hereinbefore stated, the court granted a joint motion for an inquisition, which was conducted, but whether the result thereof was brought to the attention of the court other than by depositions introduced on the trial, we are uninformed. Neither in the record proper nor in the transcript of the evidence and proceedings is there any contention that a determination should have been made of the question of defendant's mental ability to stand trial. We are convinced that we should not reverse the judgment below. Conceivably, there could be a basis for a remandment for a jury determination of the issue of competency to stand trial as ordered in *Edgerson supra,* or for a determination by the trial court whether there was reasonable ground for doubting the

sanity of defendant, or both. In the absence of any light on what consideration was given by the trial court of the question of defendant's capacity to stand trial other than that reflected in its order granting the motion for an investigation as to his sanity, we do not consider a remandment appropriate at this time. We will welcome the views of the parties on the question, if and when any application for rehearing is presented.

The judgment of the trial court should now be affirmed.

The foregoing opinion was prepared by Supernumerary Circuit Judge Leigh M. Clark, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby

Affirmed.

All the Judges concur.