No. 48,757

STATE OF KANSAS, *Appellee,* v. DAVID EARL SMITH, *Appellant.*

(574 P.2d 548)

Opinion filed December 10, 1977.

*Ray L. Borth,* of Ballweg, Borth & Wilson, of Prairie Village, argued the cause, and *Kim Daniel Richey,* of Prairie Village, was with him on the brief for the appellant.

*Michael E. Baker,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Dennis W. Moore,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict which found David Earl Smith (defendant-appellant) guilty of one count of felony murder (K.S.A. 21-3401), one count of burglary (K.S.A. 21-3412), and one count of felony theft (K.S.A. 21-3701).

The sole question on appeal is whether it was error for the trial court to instruct the jury regarding the defendant's insanity defense using the *M'Naghten* rule, and overruling the defendant's requested instruction using the American Law Institute Model Penal Code test.

On January 20, 1976, Greta Edwards was brutally beaten to death at her home in Overland Park, Kansas, by the defendant, who was her next door neighbor. The evidence is largely undisputed.

The defendant is a seventeen-year-old juvenile who was living at home with his parents and enrolled in a trade school in Kansas City, Missouri, when the murder occurred. On the day of the murder he left school shortly before noon and purchased an *eight pack of seven-ounce beer. Thereafter, he consumed the entire eight pack in addition to taking "three hits" of amphetamines.*

The defendant was next seen at a novelty store in a shopping area several blocks from his home around 1:15 p.m. While browsing in the store, he had no difficulty walking or speaking. The clerk became suspicious of him, however, and summoned the Mission, Kansas, police to the store. Officer Edwin McClain

testified he did not notice anything unusual about the defendant at the time, which was around 2:20 in the afternoon.

At approximately 3:15 p.m. the defendant's father, Bobby Smith, had just awakened and was dressing in order to pick his wife up at work. He testified when he went outside to his car he noticed several items of property lying on the ground in front of his son's car including a coin collection, a C.B. radio, a lighted dresser mirror, and a small stereo. They appeared to have blood on them. These items were later identified at the trial as belonging to the Edwards family. Also at this time Mr. Smith saw his son in the backyard of the Edwards' home, and he was walking in a northerly direction away from him.

Shortly thereafter, the defendant appeared from the north and walked down the street into his own home. His father testified he was walking in an uncharacteristic manner described as "bouncy and jumpy, faster than usual," and his appearance was disheveled and unkempt. He had blood on himself and his clothing and cuts on his left hand.

The defendant told his father Mrs. Edwards was hurt and bleeding. He then proceeded to call the police and handed the telephone receiver to his father. Mr. Smith told the police dispatcher that officers should be sent to his home. The defendant then emptied his pockets and took a Colt pistol from under his belt. Mr. Smith went next door to the Edwards' home and discovered Mrs. Edwards lying in a pool of blood on the floor on the front entryway.

The Overland Park Police Department arrested the defendant without any incident of resistance. Apparently, he originally entered the Edwards' home with the intent to commit a burglary when he was discovered by Mrs. Edwards. In his statement to the police he admitted breaking into the Edwards' home and related how Mrs. Edwards came home and called out "David" referring to her own son by the same name. The defendant liked Mrs. Edwards and had no reason for killing her. He stated, "I kept hitting her and hitting her. I started yelling 'Stop breathing and I will quit.'" His explanation for hitting Mrs. Edwards was that the last time he had been to juvenile court his probation officer told him he would be put in a mental institution.

The defendant was certified to stand trial as an adult. At his trial the pathologist who conducted the autopsy on Greta Ed-

wards testified the cause of death was innumerable blows with a blunt object to the scalp area causing compound fractures of the skull, lacerations and avulsion of the brain. Mrs. Edwards' hands were covered with lacerations and her left index finger was fractured. Mrs. Edwards' wrist watch had stopped at 3:20. This fact, viewed in the light of the record, which disclosed devastating and forceful blows to the head area together with Mrs. Edwards' obvious attempts to protect herself, rather solidly set the time of death.

The defendant offered testimony from a clinical psychologist, Dr. Edward P. Neufeld; an osteopathic physician specializing in general psychiatry, Dr. Donald Curran; and a medical doctor specializing in psychiatry, Dr. J. Scott Morrison, to support his defense of legal insanity at the time of the offense.

Dr. Neufeld first saw the defendant on January 27, 1976, when he administered a series of psychological tests to him. He testified the defendant had elevated feelings of people being against him which could be described as paranoid in nature. He said the defendant also had feelings of being strange or different from others, a fear of going crazy, and suffered from "personality disorders." When asked his opinion whether the defendant could have stopped himself from hitting Mrs. Edwards he stated, "[G]iven the very unique circumstances, hypothesized anger with his outburst of rage, given his lack of internal controls, given the panic of the situation, given the nature of the crime, no, . . . he could not have stopped on his own."

Dr. Neufeld was unable to describe the defendant's condition as "a disease of the mind" because in his professional usage that term meant an organic malady. He testified the defendant did know the nature and quality of his actions on some level, and on an "intellectual level" he did know the difference between right and wrong.

Dr. Curran agreed the defendant knew the difference between right and wrong at the time of the murder. It was his opinion, however, the defendant could not control his behavior during the passion of the moment. He testified the added elements of beer and speed "compounded his poor capacity to delay and then to do what is culturally or socially right."

Finally, Dr. Morrison conducted an extensive clinical psychological interview with the defendant. He testified about various

incidents the defendant had related to him in which the defendant felt he had no control over himself. Dr. Morrison described this psychological state as "dissociation." He stated in such a condition the defendant's awareness of what he is doing is there but his ability to alter what he is doing is not there. Dr. Morrison admitted on cross-examination, however, "dissociation" is considered an ego defense and is not considered a classically defined mental disease. Dr. Morrison testified he presumed the combination of the defendant's personality type, specifically the dissociative aspects of it, with the drugs converged at the moment he began to hit Mrs. Edwards and rendered him incapable of conforming his behavior with the law and with ethical and moral values. While he felt the defendant knew the burglary and theft were wrong and striking Mrs. Edwards was wrong, Dr. Morrison was not convinced the defendant knew he was killing Mrs. Edwards.

After the defendant's experts testified, the state called Dr. William McKnelly, Jr., as its expert. Dr. McKnelly interviewed the defendant in order to determine his competency to stand trial and his legal insanity status under the *M'Naghten* test.

Dr. McKnelly testified in his opinion the defendant had characterological problems, but he did not find a mental disease in the legal sense. He too felt the defendant knew the nature and quality of his acts and knew his acts were wrong.

At the close of the state's evidence and at the close of his own evidence, the defendant moved for a judgment of acquittal. On both occasions, the trial court overruled the defendant's motion which was based upon the American Law Institute Model Penal Code test of insanity. The trial court also overruled the defendant's objection to instructions setting out the *M'Naghten* rule.

During its deliberation, the jury asked the trial court for special instructions. Two questions were specifically presented:

"1) Must we return the same verdict on all three counts or may we separate and have different verdicts on the counts?

"2) Can insanity apply only to the time the defendant was striking the victim or does it have to include all three counts?"

The trial court refused to give any additional instructions and referred the jury to its original instructions. The jury subsequently returned a verdict of guilty on all three counts. The defendant's motion for a new trial was denied, and appeal was thereafter duly perfected.

The sole point argued by the appellant is that the rule in this state as to criminal responsibility should be changed. He asks this court to adopt the American Law Institute Model Penal Code definition which provides:

"4.01. **Mental Disease or Defect Excluding Responsibility**

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The *M'Naghten* rule has been followed in Kansas since statehood and has been the subject of judicial review on numerous occasions. (See *State v. Barry,* 216 Kan. 609, 533 P.2d 1308; *State v. Randol,* 212 Kan. 461, 513 P.2d 248; *State v. Lamb,* 209 Kan. 453, 497 P.2d 275; *State v. Harden,* 206 Kan. 365, 480 P.2d 53; *Van Dusen v. State,* 197 Kan. 718, 421 P.2d 197; *State v. Andrews,* 187 Kan. 458, 357 P.2d 739, *cert. denied,* 368 U.S. 868, 7 L.Ed.2d 65, 82 S.Ct. 80; *State v. Mendzlewski,* 180 Kan. 11, 299 P.2d 598; *Fisher v. Fraser,* 171 Kan. 472, 233 P.2d 1066; *State v. McBride,* 170 Kan. 377, 226 P.2d 246; *State v. White,* 112 Kan. 83, 209 Pac. 660; *State v. Arnold,* 79 Kan. 533, 100 Pac. 64; *State v. O'Neil,* 51 Kan. 651, 33 Pac. 287; and *State v. Nixon,* 32 Kan. 205, 4 Pac. 159.)

Here the trial court instructed on the precise language used in *State v. Andrews,* supra.

The leading case examining *M'Naghten* is *State v. Andrews,* supra, where this court defended the rule and sharply criticized a proposed adoption of *Durham v. United States,* 214 F.2d 862, 94 App. D.C. 228, 45 A.L.R.2d 1430 (1954). After analyzing the various arguments against *M'Naghten* the court said:

"It would appear to this court, that at the present time, there is no better rule for the protection of society than the one which was applied by the trial court in this case [*M'Naghten*], and which is still approved by the overwhelming weight of authority. . . ." (p. 469.)

We adhere to this view. In so holding we are mindful of the arguments against *M'Naghten,* many of which were advanced by the appellant. Briefly summarized, these include attacks on the *M'Naghten* rule because it is outdated; it covers only the cogni-

tive aspects of personality which makes it too narrow; it does not serve any rehabilitative function; it makes expert testimony impossible because of the restrictions imposed upon psychiatrists; it incorporates an over-intellectualized concept of mental disorder; it lacks definition; it has been overruled by a majority of the federal circuits and an increasing minority of states; and finally, its requirement of total incapacity rarely characterizes even an advanced psychotic. (See Annot., 45 A.L.R.2d 1447, 1455 [1956]; and Note, *Modern Insanity Tests - Alternatives,* 15 Washburn L.J. 88, 93 [1976].)

*Some of these arguments were discussed by this court in* State *v. Andrews,* supra. To its critics we reply the *M'Naghten* rule has the merit of being well-established as well as practical. Although it is not scientifically perfect, we feel it is the best criteria yet devised for ascertaining criminal responsibility. Psychiatry is a science in which great uncertainty still exists. Moreover, criminal responsibility is a legal question and not a medical question. Finally, while a majority of the federal circuits may follow the American Law Institute test, a majority of the states follow *M'Naghten.* Attention is directed to the various states which have expressly rejected the American Law Institute test.

The State of Washington has steadfastly refused to abandon the *M'Naghten* rule. In *State v. Reece,* 79 Wash. 2d 453, 486 P.2d 1088 (1971), the appellant argued the courts and psychiatrists should not have two different definitions of insanity. The court answers:

". . . [T]he appellant has cited us to no evidence that the A.L.I. test embodies a consensus of the medical profession on the nature of insanity. Our examination of recent literature in the controversy over M'Naghten and other proposed tests of insanity convinces us that there is no agreement among psychiatrists concerning a definition of insanity. . . ." (p. 455.)

The court was also reluctant to adopt the American Law Institute test because the state legislature had previously given some indication it did not consider the test a proper defense. (See also *State v. Schantz,* 98 Ariz. 200, 403 P.2d 521 [1965].)

In 1968 the Advisory Committee on Criminal Law Revision of the Kansas Judicial Council recommended the statutory enactment of the American Law Institute test. The committee identified four advantages of the American Law Institute test over *M'Naghten.* (Kansas Judicial Council Bulletin, April 1968.) Close

scrutiny of the committee study reveals all "four" advantages are concerned with one matter, the capacity test. The advisory committee felt that replacing the total incapacity test of *M'Naghten* with the substantial incapacity test would permit broader testimony by the experts. But this recommendation attempts to answer only one criticism of *M'Naghten*—restrictiveness. It fails to address other issues, particularly the confusion of juries. The Kansas legislature, however, rejected the Kansas Judicial Council's recommendation to legislatively accept the American Law Institute test, and thereby permitted our Kansas case law to prevail.

In *State v. Harkness,* 160 N.W.2d 324 (Iowa 1968), the court expressly rejects the American Law Institute test and notes:

" 'Perhaps a revision of the rules of criminal responsibility would be forthcoming if the law felt it could place greater trust and confidence in psychiatry. The spectacle not only of individual psychiatrists in disagreement, but also entire divergent schools of thought is not an inspiring one. As one authority stated, "[P]sychiatry is still more of an art than a science." ' Sauer v. United States (9 Cir.), 241 F.2d 640, 648-650." (p. 336.)

The court goes on to hold:

"However, until such time as we are convinced by a firm foundation in scientific fact that a test for criminal responsibility other than M'Naghten will serve the basic end of our criminal jurisprudence, i.e., the protection of society from grievous anti-social acts, this court has decided to continue to submit the question of criminal responsibility on the issue of insanity to the jury by the time-tested M'Naghten rule . . . ." (p. 337.)

Finally, in *Hill v. State,* ____ Miss. ____, 339 So.2d 1382 (1976), the Mississippi court defends the *M'Naghten* rule stating:

". . . Though the M'Naghten Rule may not be a perfect means to test criminal responsibility, as this Court (including this writer) has said before, it is the safest of the rules proposed. *M'Naghten* better protects society's needs than the American Law Institute's proposed rule . . . ." (p. 1385.)

(See also *State v. Miller,* ____ S.Dak. ____, 248 N.W.2d 56 [1976]; *People v. J. C. Lewis, Jr.,* 31 Mich. App. 91, 187 N.W.2d 571 [1971], *aff'd,* 386 Mich. 407, 192 N.W.2d 215 [1971], *cert. denied,* 408 U.S. 929, 33 L.Ed.2d 342, 92 S.Ct. 2505 [1972]; *State v. Malumphy,* 105 Ariz. 200, 461 P.2d 677 [1969]; *State v. Poulson,* 14 Utah 2d 213, 381 P.2d 93, *cert. denied,* 375 U.S. 898, 11 L.Ed.2d 126, 84 S.Ct. 177 [1963]; and *State v. Lucas,* 30 N.J. 37, 152 A.2d 50 [1959].)

Thus, the basic problem with any insanity test evolves from the

inability of the legal and medical professions to develop a mutual insanity standard. The legal profession functions from an *objective,* rhetorical base which seeks definitions and applies those definitions to the facts. It seeks the accountability of individual actions, the protection of society and the deterrence of crime. Conversely, the medical profession (in particular the psychiatric branch) functions from a *subjective* personality base which seeks behavioral nuances and analyzes those nuances by individual expertise. It seeks the discovery of mental illness, the rehabilitation of the patient and the abolition of punishment.

Indeed, agreement between the professions may be hopeless. Our goal is a test of criminal responsibility which offers a fair balance between competing considerations for the protection of society and the defendant as well as the rehabilitation and restoration of the defendant. We believe the *M'Naghten* rule comes the nearest to reaching this goal.

In his book, *The Insanity Defense,* Abraham Goldstein responds to the *M'Naghten* critics:

"This interpretation of *M'Naghten* has been dinned into the professional literature for so long that it is generally assumed there can be no other. As a result, the elimination of *M'Naghten* and willingness to adopt one of the newer rules, has been treated as a test of liberal faith. It is not at all certain, however, that this picture is an accurate one. If an adequate assessment is to be made, *M'Naghten* must be seen as it is presented to the jury and as the jury is likely to understand it. . . ." (p. 47.)

It may be a jury considers the evidence in the same way regardless of which insanity instruction is used. Therefore, any change in tests becomes primarily one of form rather than substance.

In the case at bar, the use of the American Law Institute test would not have afforded the experts any more latitude. Moreover, the record shows no expert was restricted in his testimony. Further, confusion in terminology would not be diminished. The least defined terms and most confusing to all participants in this struggle are "defect of reason" and "disease of the mind." The American Law Institute test uses virtually the same language with "mental illness, disease or defect." This is simply a rhetorical alteration and does nothing to diminish the confusion. In addition, it adds "substantial capacity."

Section (a) of the American Law Institute test, taken by itself, is simply a condensation of the *M'Naghten* rule. The cognitive feature is present. Knowledge of the act and its wrongfulness are present.

Section (b) of the American Law Institute test is simply a restatement of the irresistible impulse test. It recognizes the inability to conform one's conduct at the time of the act. The only significant change is the requirement of less than total incapacity.

Confusion resulting from the adoption of the American Law Institute test has prompted comment by several experts. In the article, *To Be Or Not To Be An Expert,* 1973 Washington U. Law Quarterly, 57, Dr. Robert Schulman, of the Menninger Foundation, evaluates one federal circuit decision by stating:

"The majority views its decision as a step forward and as an effort to untangle the complicated rules of criminal responsibility; but from the expert's view it may be a step backward, not because of restrictions placed on testimony but because of the complete lack of understanding by the court of the framework within which the expert works. This dismal abyss, after so many years of attempts at rapprochement between the law and its experts, brought the court to the point of castigating the expert, which was unnecessary if the court only wished to change the legal rule regarding insanity." (p. 61.)

A companion article voices the same concern:

"I submit that today the psychiatrist is unable to perform effectively any of these tasks well; further, that he does them less well now than he did eighteen years ago when *Durham* was adopted; and still further, that he is not going to do better under any variant of the American Law Institute formulation, no matter how legally sophisticated it may be presented." (Diamond, *From Durham to Brawner, A Futile Journey,* 1973 Washington U. Law Quarterly 109, 111.)

Finally, we note the testimony in this case failed to satisfy the American Law Institute test. The defendant failed to offer an expert witness who could conclusively state he suffered from a mental disease or defect. A "personality disorder" coupled with the voluntary intoxication of drugs and alcohol and the passion of the moment falls short of the American Law Institute's standards for mental disease or defect.

We retain the *M'Naghten* rule in Kansas because no other test better protects society as well as serves its needs.

The judgment of the lower court is affirmed.

PRAGER, J., dissenting: I respectfully dissent. The majority opinion points out quite accurately that at this stage in the development of criminal law administration there are differing evaluations and views as to the social utility and desirability of the *M'Naghten,* the ALI, and the *Durham* tests or rules pertaining to the defense of insanity in the trial of criminal offenses. In my

judgment the time has come to reject the outmoded *M'Naghten* test and to adopt the test proposed by the American Law Institute Model Penal Code. Since I am not in agreement with the majority, I deem it necessary to express the reasons for my position.

First, I think it would be helpful to state the question which is before the court for determination. The question is: What rule, consistent with personal responsibility and constitutional limitations, can, with justice, fairness, and concern for the public interest, be applied so that mentally ill persons are not found guilty of crimes which they did not at the time have the legal capacity to commit? Approximately ten years ago the Kansas Judicial Council was given the responsibility to draft a new criminal code for this state. Included in its overall task was the problem of defining "legal insanity" and of developing criteria to establish irresponsibility in criminal cases. In the April 1968 issue of the Kansas Judicial Council Bulletin, the council proposed the adoption of the ALI test or standard. In so doing, the council in its comment under the proposed statute discussed in depth the problem presented and set forth its reasons why the *M'Naghten* rule should be abolished and the ALI rule adopted. In this regard the council stated:

"The problem of defining the criteria of irresponsibility is one of the most difficult and controversial in the criminal law. A general lack of understanding of the conditions that produce irresponsibility as well as an apparent lack of sympathy and communication between the courts and law enforcement personnel on the one hand and the behavioral scientists on the other have contributed to the difficulty.

"Any system of criminal justice that holds the individual responsible for anti-social acts done in the exercise of free will must provide standards for excepting from responsibility those injurious acts done under circumstances which destroy or impair free will. Patently, the punishment of an offender whose act is a manifestation of insane frenzy is both unjust and futile. It is unjust because the offender had no ability to know or to conform to the norm. It is futile because it cannot possibly deter other similar acts. The idea of deterrence presupposes a rational individual, capable of weighing values and selecting among them. It follows that some criterion of irresponsibility is an essential of a system of penal law.

"Kansas presently has no statutory test of criminal responsibility, but follows the traditional M'Naghten rule which has been implemented by numerous judicial decisions. (See *State v. Andrews,* 187 Kan. 458). This test fixes responsibility on the accused when he knows the nature and quality of his act and knows that the act is wrong.

"Several possibilities confronted the drafters of this Code. (1) The subject may be wholly omitted from the statute, in which case the M'Naghten rule will stand.

(2) The proposed statute may state the M'Naghten rule, thus seeking to give legislative reinforcement to the judicially developed standard. (3) The draft may provide a new and different test of criminal responsibility. Alternatives considered by the advisory committee were (a) the 'irresistible impulse' test, (b) the Durham or 'product' test, (c) the A.L.I. Model Penal Code test, and (d) the A.L.I. test as modified in the Currens case (*U.S. v. Currens,* 3 Cir., 290 F.2d 751).

"The committee has determined that the American Law Institute's Model Penal Code test provides the best opportunity for reconciling the traditional concept of moral and legal accountability with contemporary scientific approaches to mental illness and deficiency. The language of the proposal is taken from the New York adaptation of the A.L.I. test. The following material in this comment is a rephrasing and adaptation of a portion of the New York Commission's 1963 Interim Report (Appendix B, Report of New York Temporary Commission on Revision of the Penal Law), and is here set forth as an expression of the thinking of the Kansas Advisory Committee.

"Without attempting a full statement of the defects of the M'Naghten rule, we are agreed that an amendment should be drawn to overcome the following objections:

"(1) There is, first, the difficulty that inheres in the ordinary meaning of the word 'know,' as applied to persons suffering from serious mental illness. The fact that the defendant is able to verbalize the right answer to a question, to respond, for example, that murder or stealing is wrong, or the fact that he exhibited a sense of guilt as by concealment or by flight, is often taken as conclusive evidence that he knew the nature and the wrongfulness of his behavior. Yet one of the most striking facts about the abnormality of many psychotics is that their way of knowing is entirely different from that of the ordinary person. In psychiatric terms, their knowledge is usually divorced from all effect, which is to say that it is like the knowledge children have of propositions they can state but cannot understand; it has no depth and is divorced from comprehension. The present rule makes it very difficult to put this point before the jury, though it often is the crucial point involved. It seems clear that the knowledge that should be deemed material in testing responsibility is more than merely surface intellection; it is the appreciation sane men have of what it is that they are doing and of its legal and its moral quality.

"(2) The M'Naghten rule improperly confines the inquiry to the effect of mental illness or defect upon the actor's cognitive capacity; the finding must be that he did not know the nature or wrongfulness of the act. The limitation is, as Judge Cardozo pointed out, faithful neither to the facts of mental life nor to the demands of legal, ethical or social policy.

"Mental illness, even in its extreme forms, may not destroy the minimal awareness called for by M'Naghten, while destroying power to employ such knowledge in determining behavior, the capacity that rational human beings have to guide their conduct in the light of knowledge. The point is a related one to that which we have made respecting the impairment of capacity to know. Capacity to know the nature and wrongfulness of conduct may not have been discernibly destroyed and yet the transformations in ability to cope with the external world, worked by severe psychosis, may have otherwise destroyed the individual's capacity for self-control, in consequence of mental illness or defect, which from

the point of view of morals and of legal policy warrants the special treatment of the irresponsible, the statute forces a discrimination which is neither logical nor just. We think that the discrimination should be rectified.

"(3) A final difficulty which we think demands attention turns on the degree of the impairment of capacity to know or to control that ought to be demanded before irresponsibility may be acknowledged. Taken on its face, the present rule calls for an impairment that is total; the actor must not know. This extreme conception poses what some have thought the largest problem in the just administration of the test.

"Even in the most extreme psychoses, there is often some residual capacity to know or to control; and, judging after the event, the psychiatric expert hardly can declare on oath that at the time of the disputed action the actor was totally bereft of knowledge or control. Yet this is a dilemma that it certainly is not deliberate legal policy to pose. In other situations, where the facts of life do not submit to any absolute appraisal, the law has been content to recognize that it must tolerate distinctions of degree. We think that such recognition is required here. People of relative sanity, on whom the threats of penal law can exert a deterrent force and who are within the range of influence of programs for correction, differ from the seriously deranged in the respect that theirs is an appreciable or substantial capacity to know and to control. We think a statute should be framed to recognize that this is so and to avoid a finding of responsibility for those psychotics who may have some remnant of capacity, however grossly it has been impaired by their illness.

"The changes that the proposed formulation would effect may be summarized as follows:

"1.   With respect to the question which now is material under M'Naghten, the inquiry would be not merely whether the actor lacked *knowledge* of the nature and the wrongfulness of his behavior but also whether he was lacking in capacity to *appreciate* its wrongfulness. By adding the requirement of appreciation to that of knowledge, we would expect the courts to grant some leeway to an explication of the distinction between mere verbalization and a deeper comprehension, which we have discussed above. Moreover, since a person who is lacking in capacity to know or to appreciate the *nature* or the *quality* of his action, as those terms are understood in law, is necessarily incapable of an appreciation of its wrongfulness, we have thought it unnecessary to deal with the former possibility explicitly in statement of the principle.

"2.   Instead of asking whether the defendant did not know we think the legal inquiry should be addressed to his *capacity* to know or to appreciate. The reason is that any testimony by the psychiatric expert, addressed to the actor's mental state at the time in the past, will necessarily involve an inference upon his part from his judgment as to the actor's powers or capacity. We think the law gains in clarity by making this explicit.

"3.   The inquiry is not confined to the impairment of capacity to know or to appreciate the wrongfulness of the defendant's conduct. For reasons stated earlier, it extends also to the capacity of the actor to conform his conduct to the requirements of the law.

"4.   Finally, both in dealing with capacity to know or to appreciate and with capacity to conform, the question posed is not whether the actor wholly lacked the

requisite capacity but whether he lacked substantial capacity—meaning thereby, the quantum of capacity that represents a fair appraisal of the wide range that in our culture excludes a diagnosis of severe mental illness or defect. The scope of that range is essentially a problem for the psychiatric sciences, to be reflected in the testimony of the expert witness, but sifted and evaluated by the court and jury in the light of common sense.

"We also propose a further paragraph as follows:

"(2) The terms 'mental illness or defect' do not include an abnormality manifested only by repeated criminal or anti-social conduct.

"The purpose of this paragraph is to exclude from the concept of 'mental illness or defect' and thus from the standard of irresponsibility so-called psychopathic or sociopathic personalities. These terms are employed by some psychiatrists to categorize persons who are insensitive to moral and social norms, as evidenced by their persistent and repeated conduct. Those psychiatrists who would regard such persons as the victims of illness proceed upon the theory that capacity for law-abiding living in society is a constituent of mental health, with the conclusion that its absence is illness; or else on the hypothesis that physical disorder underlies all maladjustment of this kind, although the present state of knowledge may not serve to explicate the nature of the psychical disorder except in terms of its results." (pp. 35-38.)

The advisory committee of the Kansas Judicial Council which proposed the ALI standard consisted of some of the most distinguished lawyers and judges of this state. I consider their comments and rationale to be just as true and legally sound today as they were when their report was originally proposed in 1968.

The Kansas legislature, in considering the new proposed criminal code in 1969, decided to omit the proposed definition of insanity from the statutory provisions. I do not consider this as a legislative rejection of the ALI standard or as positive support for the *M'Naghten* standard. It seems to me more logically correct to say that the legislature determined that the question of a definition of "legal insanity" should be left for the determination of the supreme court, so that, in its wisdom, the court might select the most appropriate standard or criteria for "legal insanity." In other words, the problem remains a judicial one, and it is for us to solve the problem.

In 1968 a great majority of the jurisdictions in this country followed the *M'Naghten* rule. Since that time, many states, either by statute or judicial decision, have rejected the *M'Naghten* rule and have adopted the ALI standard in some form. In January of this year the Supreme Court of Tennessee in *Graham v. State,* 547 S.W.2d 531 (Tenn. 1977), discarded the *M'Naghten* rule and adopted the ALI standard. I refer the reader to the excellent

analysis of the subject in that opinion. Even more recently the United States Court of Military Appeals on July 25, 1977, rejected the *M'Naghten* standard and adopted the ALI standard as a test of legal insanity to be applied in all criminal prosecution arising under the Uniform Code of Military Justice. (*United States v. Frederick*, 3 M.J. 230 [C.M.A. 1977].)

The standard has been adopted by all but one of the United States Courts of Appeal. (See *United States v. Freeman*, 357 F.2d 606 [2nd Cir. 1966]; *United States v. Currens*, 290 F.2d 751 [3rd Cir. 1961]; *United States v. Chandler*, 393 F.2d 920 [4th Cir. 1968]; *Blake v. United States*, 407 F.2d 908 [5th Cir. 1969]; *United States v. Smith*, 404 F.2d 720 [6th Cir. 1968]; *United States v. Shapiro*, 383 F.2d 680 [7th Cir. 1967]; *Pope v. United States*, 372 F.2d 710 [8th Cir. 1967]; *Wade v. United States*, 426 F.2d 64 [9th Cir. 1970]; *Wion v. United States*, 325 F.2d 420 [10th Cir. 1963], *cert. den.* 377 U.S. 946 [1964]; *United States v. Brawner*, 471 F.2d 969 [D.C. Cir. 1972].) The only federal circuit which has not adopted the ALI standard is the first circuit, which has not yet decided the issue. (*Amador Beltran v. United States*, 302 F.2d 48 [1st Cir. 1962].)

In the opinion of the court in this case the statement is made that a majority of the state jurisdictions today follow the *M'Naghten* rule. This statement is incorrect. A careful review of the statutes and cases in the various state jurisdictions has convinced me that the *M'Naghten* rule, which restricts legal insanity to the defendant's capacity to know or appreciate the wrongfulness of his act, is accepted and followed today in only eighteen (18) states. Five (5) states have adopted a combined *M'Naghten*—irresistible impulse rule which permits the jury to consider not only the defendant's capacity to know or appreciate the wrongfulness of his act, but also the defendant's lack of capacity to control his actions or to resist the doing of the wrongful act. The *Durham* rule is applied only in the state of New Hampshire. The ALI standard has been adopted in some form in twenty-six (26) states.

The various statutes and court decisions do not follow any universal language. There is a wide difference in the phraseology used. What is important is the fact that the great majority of the jurisdictions have rejected the *M'Naghten* rule as the sole test of legal insanity. For purposes of analysis I have classified each of

the fifty (50) states as to its present position with respect to the *M'Naghten* rule and have included the particular statute or court decision which supports the classification. The following states have adopted the pure *M'Naghten* rule which ignores any lack of capacity of the defendant to control his behavior:

1. Arizona: *State v. Noble,* 113 Ariz. 99, 546 P.2d 1130 (1976); Ariz. Rev. Stat. § 13-502 (Supp. 1977) (effective Oct. 1, 1978).

2. California: *People v. Kelly,* 10 C.3d 565, 516 P.2d 875, 111 Cal. Rptr. 171 (1973).

3. Florida: *Anderson v. State,* 276 So. 2d 17 (Fla. 1973).

4. Iowa: *State v. Lass,* 228 N.W.2d 758 (Iowa 1975).

5. Kansas: *State v. Andrews,* 187 Kan. 458, 357 P.2d 739.

6. Louisiana: La. Rev. Stat. Ann. § 14:14 (West).

7. Minnesota: Minn. Stat. Ann. § 611.026 (Supp. 1976) (West). The Minnesota statute clearly adopts the *M'Naghten* rule. However, in *State v. Rawland,* 294 Minn. 17, 199 N.W.2d 774 (1972), the Supreme Court of Minnesota construed the statute to permit the jury to consider not only evidence relating to the defendant's cognition, that is, his knowledge of the nature of the act and its wrongfulness, but also the element of volition and his capacity to control his behavior. Thus the Minnesota statute has been judicially construed to permit a jury to consider the essential criteria contained in the ALI test.

8. Mississippi: *Hill v. State,* 339 So. 2d 1382 (Miss. 1976).

9. Nebraska: *State v. Russell,* 194 Neb. 64, 230 N.W. 2d 196 (1975).

10. Nevada: *Williams v. State,* 85 Nev. 169, 451 P.2d 848, *cert. den.* 396 U.S. 916 (1969).

11. New Jersey: *State v. Maik,* 114 N.J. Super. 470, 277 A.2d 235, modified, 60 N.J. 203, 287 A.2d 715 (1972); overruled as to another matter, *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975).

12. North Carolina: *State v. Hammonds,* 290 N.C.1, 224 S.E.2d 595 (1976).

13. Oklahoma: *Suits v. State,* 507 P.2d 1261 (Okla. Crim. 1973).

14. Pennsylvania: *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976).

15. Rhode Island: *State v. Page,* 104 R.I. 323, 244 A.2d 258 (1968).

16.   South Carolina: *State v. Valenti,* 265 S.C. 380, 218 S.E.2d 726 (1975).

17.   South Dakota:   S.D. Compiled Laws Ann. § 22-3-1(4).

18.   Washington:   Wash. Rev. Code § 9A.12.010.

The following states have rejected the limited test of *M'Naghten* and have added as an alternative test of legal insanity, the incapacity of the defendant to control his actions because of some irresistible force or impulse.

1.   Alabama: *Johnson v. State,* 56 Ala. App. 105, 319, So. 2d 725 (1975).

2.   Colorado:   Colo. Rev. Stat. § 16-8-101.

3.   Georgia:   Ga. Code Ann. § 26-702; 26-703.

4.   New Mexico: *State v. Chambers,* 84 N.M. 309, 502 P.2d 999 (1972).

5.   Virginia: *Thompson v. Commonwealth,* 193 Va. 704, 70 S.E.2d 999 (1972).

The following states have adopted in substance the ALI standard, although the exact language used in the particular statute or court decision may vary:

1.   Alaska:   Alaska Stat. § 12.45.083.

2.   Arkansas:   Ark. Stat. Ann. § 41-601 (Supp. 1976).

3.   Connecticut:   Conn. Gen. Stat. Ann. § 53a-13 (Supp. 1977).

4.   Delaware:   Del. Code tit. 11, § 401 (1953).

5.   Hawaii:   Haw. Rev. Stat. § 704-400 (Special Supp. 1975).

6.   Idaho:   Idaho Code § 18-207 (Supp. 1977).

7.   Illinois:   Ill. Ann. Stat. ch. 38, § 1005-1-11. (Smith-Hurd).

8.   Indiana:   *Hill v. State,* 252 Ind. 601, 251 N.E.2d 429 (1969).

9.   Kentucky:   Ky. Rev. Stat. § 504.020.

10.   Maine:   Me. Rev. Stat. tit. 17-A, § 58 (Supp. 1976).

11.   Maryland:   Md. Ann. Code art. 59, § 25.

12.   Massachusetts: *Commonwealth v. McHoul,* 352 Mass. 544, 226 N.E.2d 556 (1967).

13.   Michigan:   Mich. Stat. Ann. § 28.1044(1) (Supp. 1977).

14.   Missouri:   Mo. Ann. Stat. § 552.030 (Supp. 1977) (Vernon).

15.   Montana:   Mont. Rev. Codes Ann. § 95-501 (Supp. 1977).

16.   New York:   N.Y. Penal Law § 30.05 (McKinney).

17.   North Dakota:   N.D. Cent. Code § 12.1-04-03; N.D. Cent. Code § 12.1-04-03 (Supp. 1977).

18. Ohio: *State v. Jackson*, 32 Ohio St. 2d 203, 291 N.E.2d 432 (1972), *cert. den.* 411 U.S. 909 (1972).

19. Oregon: Or. Rev. Stat. § 161.295.

20. Tennessee: *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977).

21. Texas: Tex. Penal Code Ann. § 8.01 (Vernon).

22. Utah: Utah Code Ann. § 76-2-305 (Supp. 1977).

23. Vermont: Vt. Stat. Ann. tit. 13, § 4801.

24. West Virginia: *State v. Myers*, ____ W. Va. ____, 222 S.E.2d 300 (1976).

25. Wisconsin: Wis. Stat. Ann. § 971.15 (West).

26. Wyoming: Wyo. Stat. § 7-242.4(a) (Supp. 1975).

In summary, it may be stated that the *M'Naghten* rule is no longer the majority rule in this country. The demise of the *M'Naghten* rule is well deserved. It is based upon a primitive concept of the psychological makeup of a human being. It is a rule which ignores a century of knowledge gained from an intensive study of the human mind and its mental processes. In line with the trend of the last ten years, I would reject the outmoded *M'Naghten* test.

In the majority opinion it is stated that the defendant failed to offer an expert witness who could conclusively state that the defendant suffered from a mental disease or defect. The majority then concludes that it would not have made any difference if the jury had been instructed on the ALI standard. This is not a fair statement of the evidence. The defense offered testimony to show that the defendant had a history of psychological dissociation. Two medical experts testified that the defendant, because of his psychological makeup, was incapable of conforming his behavior with the law and with ethical and moral values. One medical expert testified unequivocally that in his opinion the defendant did not have the capacity to control his behavior at the time the homicide was committed. This evidence clearly would require an appropriate instruction on the defense of legal insanity.

I would reverse and remand the case for a new trial with directions to the trial court to instruct the jury on the ALI standard for legal insanity as set forth in the defendant's proposed instructions.

OWSLEY, J., joins in the foregoing dissenting opinion.